**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 13-cv-23878-UU**
**Judge: Hon. Ursula Ungaro**
**Magistrate Judge: None assigned**

| | |
|---|---|
| ATUL KAMAR SOOD, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>     Plaintiff,<br>  vs.<br><br>CATALYST PHARMACEUTICAL PARTNERS INC., PATRICK J. MCENANY<br><br>    Defendants. | **CASE No.: 13-cv-23878-UU**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Court-appointed lead plaintiffs Ward Rijnsburger, Luis Aranaz, and Jared Pereira, ("Plaintiffs") individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against defendants, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters:

1

## I.   NATURE OF THE ACTION

1.      This is a federal securities class action brought on behalf of a class consisting of all persons other than defendants who purchased Catalyst securities between August 27, 2013 and October 18, 2013, inclusive (the "Class Period"), pursuing remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 against Catalyst Pharmaceutical Partners, Inc., and its CEO, Patrick J. McEnany ("McEnany").

2.      Since early 2013, Catalyst has styled itself an orphan drug company seeking FDA approval for its drug Firdapse to treat Lambert-Eaton Myasthenic Syndrome ("LEMS"). In a furious promotional blitz to keep itself alive during the Class Period, Catalyst told investors that it is a company trying to develop a drug for a 3,000 U.S-patient community with "***no effective treatment***" for their disease winning a race to approval against a distant competitor. But the community has less than 1700 members and probably no more than 1000, and the competitor and Catalyst are neck-and-neck because the competitor – Jacobus Pharmaceutical Co., Inc. – had been providing its effective drug, for free, to LEMS patients in the U.S., for twenty years.

3.      Catalyst was founded by defendant McEnany in January 2002, and has never had more than seven employees. It initially aimed to develop drugs to treat cocaine addiction. Before 2012, it had run several clinical trials on the drugs; the trials failed.

4.      In 2012, Catalyst was on its last legs. It had burned through more than $44 million, which it had raised by selling its stock. The NASDAQ, the exchange on which it trades had warned it that it must increase the price of its shares, or be stricken from it – cutting off its ability to sell the stock to get the funding it needed to survive.

5.      But Catalyst was running a Phase II(b) clinical trial for its lead drug. It promised investors results were due in the fourth quarter of 2012; it raised $6,000,000 on August 28, 2012 based on the promise of these results.

6.      On November 8, 2012, Catalyst announced the test's results: Catalyst's drug had failed. Catalyst's stock price fell immediately, to far below the threshold the NASDAQ required, which again threatened to strike Catalyst's stock's listing. Catalyst placed the drug's development on hold. Its survival was in serious doubt.

7.      But on October 31, 2012, less than a week earlier, Catalyst had made a curious announcement. It had told investors that it had just bought the U.S. rights to seek approval for, and then to market and sell, a drug, Firdapse.

8.      Firdapse was approved by European authorities to treat a condition, Lambert-Eaton Myasthenic Syndrome ("LEMS"), that is vanishingly rare both in Europe and here. Drugs that are used to treat diseases with fewer than 200,000 U.S. patients are called "orphan drugs," and companies seeking FDA approval for orphan drugs receive benefits from the FDA, including tax breaks and subsidies. But the most important benefit by far is a seven year market exclusivity period. The market exclusivity operates as to the disease; thus, even if a competitor can patent around the exclusivity, it may not sell its drugs during the company's exclusivity period.

9.      Unable to survive on the wreckage of the drugs that it had sought to approve for ten years, Catalyst reinvented itself as a drug company targeting orphan drugs – for little more reason than that it had just bought the rights to Firdapse, which was an orphan drug.

10.      Catalyst then entered into a high-stakes promotional campaign. It had to get its stock price up to $1.00 to meet the NASDAQ's mandate. Then it had to keep it there to sell its

stock to finance its operations. And it had no experience with either LEMS or Firdapse, and very little experience with orphan drugs.

11.     And, moreover, LEMS was particularly unsuited to commercial exploitation. Most estimates place the U.S. LEMS population at about one thousand persons. Virtually all estimates provide that there are no more than about 1700 U.S. patients with LEMS. And this population is reasonably well-serviced; a tiny private company, Jacobus Pharmaceutical Company Co., Inc., provides its drug to patients, free of charge, so long as the patient can get the FDA's approval for the use. Jacobus will even help patients obtain approval – guiding them through the paperwork, sending them draft documents, and even making phone calls on their behalf. And the drug Jacobus provides – 3,4-DAP – is virtually identical to Firdapse, with the only difference that 3,4-DAP cannot be stored at room temperature. And between Jacobus and compounding pharmacies, virtually every patient who needs 3,4-DAP can get it. And Jacobus itself was running its own pivotal clinical trial. And 3,4-DAP *works*; LEMS causes crippling weakness in the legs, arms, facial muscles, leaving many patients bedridden; upon taking 3,4-DAP, these symptoms are immediately and greatly eased.

12.     Thus, Catalyst's publicity campaign required it to convince investors that it was the first to treat a terrible disease, rather than a late entrant seeking to oust a well-established, well-loved competitor. To do so, Catalyst made three false statements. First, it told investors the U.S. LEMS population numbers 3,000. Second, it told investors there is "no effective treatment for LEMS." And third, Catalyst told investors its own trial was on Phase III, and that its competitor's was on Phase II; thus, it told its investors, Catalyst was ahead of the competition; it would get the seven-year orphan drug market exclusivity, not its competitor, who would be locked out of the market for seven years.

4

13.     None of the statements are true. Only Catalyst and the company from whom it bought the rights to Firdapse claim the U.S. LEMS population is anywhere near 3,000; there is an effective treatment – 3,4-DAP – and most LEMS patients are taking it; and for a drug like Firdapse, the designation of "Phase II" versus "Phase III" is a red herring, as Catalyst itself recognized by calling its trial Phase III without having ever conducted a Phase II trial.

14.     By August 2, had brought its stock's price above the NASDAQ threshold. On August 27, it issued a press release which both claimed there was no effective treatment for LEMS and that there were 3,000 patients in the U.S., and its price soared up $0.59 per share – or 41.5% -- to $2.01.

15.     Defendants wasted no time cashing in. *The next day*, McEnany awarded himself a three year extension on his contract, and *within two weeks*, Catalyst had sold $15.1 million of its stock in a public offering.

16.     On October 18, 2013, after speaking with Jacobus, journalist Adam Feuerstein published an article about Catalyst, which showed that LEMS patients were already receiving an effective treatment. Feuerstein also informed Catalyst shareholders that far from welcoming their company's new drug, LEMS patients were terrified of it because approval of Firdapse could prevent Jacobus from providing to them 3,4-DAP, forcing them instead to try to buy Firdapse, which would be beyond their means. As one patient put it, they would return to being vegetables.

17.     On October 18 and 21, the next trading day, Catalyst's stock price fell by $1.09 to $1.52, or 42%, damaging investors.

## II.     PARTIES AND IMPORTANT NON-PARTIES

a. *Plaintiffs*

5

18.     Plaintiff Ward Rijnsburger, as set forth in his Certification which was previously filed on the Court's docket, purchased Catalyst stock during the Class Period at artificially inflated prices and has been damaged thereby.

19.     Plaintiff Luis Aranaz, as set forth in his Certification which was previously filed on the Court's docket, purchased Catalyst stock during the Class Period at artificially inflated prices and has been damaged thereby.

20.     Plaintiff Jared Pereira, as set forth in his Certification which was previously filed on the Court's docket, purchased Catalyst stock during the Class Period at artificially inflated prices and has been damaged thereby.

b.   *Defendants*

21.     Defendant Patrick J. McEnany is a co-founder of Catalyst, and was at all relevant times its Chairman, President, and Chief Executive Officer.

22.     Defendant Catalyst Pharmaceutical Partners, Inc., is a Delaware corporation whose principal executive offices are at 355 Alhambra Circle, Suite 1370, Coral Gables, Florida. As of April 1, 2013, it had six employees. In October 2012, Catalyst acquired from BioMarin Pharmaceutical, Inc. the rights to seek FDA approval for Firdapse, and then market and sell it in the U.S. Firdapse is used to treat Lambert-Eaton Myasthenic Syndrome ("LEMS").

23.     Catalyst's stock is traded on the NASDAQ stock exchange under ticker CPRX.

c.   *Non-parties*

24.     BioMarin Pharmaceutical, Inc., is a California-based Delaware corporation. In October 2009, BioMarin acquired Huxley Pharmaceuticals, Inc., a company which held patents on Firdapse, a proprietary form of 3,4-DAP. BioMarin obtained European approval to sell Firdapse, largely by citing Jacobus's studies.

25.     Jacobus Pharmaceuticals, Inc., is a small private pharmaceutical company based in New Jersey. It initially sought FDA approval to market and sell 3,4-DAP, and conducted early clinical trials in the early 1990's. In 1997, the FDA approached Jacobus and encouraged them to file a New Drug Application. But at the time, Jacobus was distracted by and financially obligated to its Tuberculosis drug. Nonetheless, it has continued to provide 3,4-DAP, for free, to any patient who obtains FDA approval to receive it through compassionate use programs. Jacobus also provides assistance to patients who wish to obtain 3,4-DAP, including providing them with a draft informed consent form. Patients have high praise for Jacobus, and David and Laura Jacobus. For example, Confidential Witness ("CW") 1 says "David and Laura Jacobus are the most magnificent people in the world." CW 2 says Jacobus is "awesome" and "amazing", that she can "call them anytime," and that the Jacobuses keep in touch with their patients.

26.     Jacobus has resumed seeking FDA approval to market and sell 3,4-DAP. CW Jacobus is currently running a pivotal clinical trial for 3,4-DAP.

27.     CW 1 is a U.S. patient with LEMS, and participated in a 3,4-DAP clinical trial in 1994. Since then, he received 3,4-DAP from Jacobus.

28.     CW 2 is a U.S. patient with LEMS, and participated in an early 3,4-DAP clinical trial at Duke. She took 3,4-DAP for twenty years, through Jacobus. She is active in the LEMS community, and manages a LEMS Facebook support group with about 300 members.

### III.     BACKGROUND

#### a.  LEMS

29.     Lambert-Eaton Myasthenic Syndrome ("LEMS") is a crippling neuromuscular disease. It causes extreme muscle weakness, typically beginning in the legs, but expanding to both arms and legs in most patients, and often face, mouth, eye, respiratory, and other muscles. It

7

leaves patients fatigued and physically weak. Patients often are unable to exercise, or walk or even stand for long periods. If LEMS reaches the patient's respiratory system, it can be fatal.

30.      Life for patients with untreated LEMS is bleak. For example, CW 1 describes his life when his LEMS was untreated as that of a "bedridden" "vegetable" who "could not walk." CW 2 says she "could not get up" without LEMS.

31.      LEMS is an orphan disease. The leading academic article estimate its prevalence, per million people, as between 2.3 and 5, suggesting that there are between about 700 and 1600 persons with LEMS in the U.S.[1] The American Association of Neuromuscular & Electrodiagnostic Medicine estimates that the prevalence is 1 per million, suggesting that there are about 320 patients in the U.S. Orphanet, an organization led by a consortium of around 40 countries, appears to estimate its prevalence at 3-4 per million, suggesting that there are about 960-1180 patients in the U.S. Wikipedia claims 3.4 per million, suggesting about 1070 patients in the U.S. Laura and David Jacobus estimate that there are fewer than a thousand LEMS patients in the U.S. CW 1, a U.S. patient who has had LEMS for 20 years and is active in the LEMS community, believes there are about 300 LEMS patients in the U.S. CW 2, who has also had LEMS for decades and runs a LEMS Facebook support group, reports that there definitely are not 3,000 LEMS patients in the U.S.

32.      LEMS is only diagnosed by a neurologist; the diagnosis is usually made by an academic neurologist with a sub-specialty in peripheral neuromuscular diseases.

   **b.  3,4-DAP**

---

[1] PW Wirtz et al, The epidemiology of the Lambert-Eaton myasthenic syndrome in the Netherlands, available at < http://www.neurology.org/content/63/2/397.extract>.

33.    There is no FDA-approved treatment for the symptoms of LEMS. But many scientific studies – dating back decades – have shown that 3,4-diaminopyridine (better known as 3,4-DAP) is safe and effective in treating LEMS's symptoms.[2]

34.    Linda and David Jacobus report that 3,4-DAP has an immediate, substantial effect; that it is well tolerated by patients; that it has few or no major side effects; and that patient adherence is virtually complete.

35.    Patients Plaintiffs spoke with make the same claim. For example, CW 1, who has been taking 3,4-DAP to treat LEMS since 1994, calls 3,4-DAP an "amazing drug" that changed his life and others' – going from a "vegetable" to someone who daily exercises by swimming and walking. CW 2 was in a nursing home, for five months; within about a month of taking 3,4-DAP, she recovered, and was discharged.

36.    In the U.S., 3,4-DAP is available from both compounding pharmacies and Jacobus.

37.     Firdapse is just a proprietary form 3,4-DAP. Firdapse adds a phosphate salt to 3,4-DAP, which allows Firdapse to be stored at room temperature. But there is no other known difference between the two. Indeed, in seeking approval for Firdapse in Europe, BioMarin just

---

[2] *See, e.g.*, Molgo, J., and Guglielmi, JM, 3,4-Diaminopyiridine, an orphan drug, in the symptomatic treatment of Lambert-Eaton myasthenic syndrome (1996) (review article) ("The general view [in the medical literature] is that 3,4-DAP is well tolerated in short- or long-term treatments, with only mild side effects"); Wirtz PW, Titulaer MJ, Gerven JM, and Verschuuren JJ, 3,4-diaminopyridine for the treatment of Lambert-Eaton myasthenic syndrome (2010) (review article) ("This article describes the four randomized placebo-controlled trials of 3,4-DAP in patients with LEMS. All trials demonstrated a significant effect on muscle strength and compound muscle action potential amplitude [...] The side effects of 3,4-DAP are generally mild [...] Given the efficacy and safety of 3,4-DAP in LEMS, this drug is the mainstay for symptomatic treatment of LEMS.")

cited Jacobus's clinical studies, conducted on 3,4-DAP; Catalyst itself cites studies employing 3,4-DAP to support its claim that Firdapse is effective.

        c. ***Obtaining 3,4-DAP in the U.S***.

38.     U.S.-residing patients who have been diagnosed with LEMS may obtain 3,4-DAP, with an adequate prescription, from two separate sources: they may obtain it Jacobus under an Expanded Access/Compassionate Use program, or buy it from a compounding pharmacy.

39.     Laura and David Jacobus and CW 1 each report that between compounding pharmacies and Jacobus, nearly all patients who wish to obtain 3,4-DAP can.

### i. Through Jacobus

40.     Jacobus currently provides 3,4-DAP to about 200 patients, at no cost, enrolled in Expanded Access programs.

41.     The FDA generally forbids provision of an unapproved drug outside of a clinical trial. But the FDA will sometimes permit a manufacturer to offer unapproved drugs for compassionate use on a case-by-case basis.

42.     To be entitled to compassionate use, the patient or treating physician must show:

        a. That the patient has a "serious or immediately life threatening disease or condition"[3]; and

        b. That there are "no comparable or satisfactory alternative treatment options."[4]

43.     To obtain compassionate use approval, patients must first be diagnosed with LEMS. Then, they must contact an FDA approved doctor or facility to get 3,4-DAP.

---

[3] Access to Investigational Drugs Outside of a Clinical Trial (Expanded Access), available at < http://www.fda.gov/ForConsumers/ByAudience/ForPatientAdvocates/AccesstoInvestigationalDrugs/ucm176098.htm>.

[4] *Id.*

44.     If an individual does not know where the nearest FDA-approved doctor or facility is, they may call Jacobus. Kathy Ales, a Jacobus doctor, will then advise them.

45.     Jacobus also supports physicians and patients' applications, and will supply them with (a) a complete list of necessary paperwork and where it must be sent, and (b) an informed consent form specifically for compassionate use of 3,4-DAP. Jacobus may also place calls on the patient's behalf, as they did for CW 2.

46.     If FDA approves the application, Jacobus will provide the patient with 3,4-DAP by shipping it to their doctor or directly to the patient.

47.     If the ice chest in which Jacobus provides 3,4-DAP is not returned, Jacobus will charge $10. Other than this, though, patients will not be charged any fee by Jacobus.

48.     When enrolled in an Expanded Access program for 3,4-DAP, LEMS patients are initially monitored for a period of time. If the drug performs well for the patient under such monitoring, the monitoring will then be limited to an annual institutional review board at a local hospital to continue approval of 3,4-DAP.

## ii.  Through a compounding pharmacy

49.     3,4-DAP is available through compounding pharmacies.

50.     Compounding pharmacies are pharmacies operating under a state license to manufacture and provide drugs to meet patients' individual need. Compounding pharmacies are also regulated by the FDA.

51.    CW 1 reports that 100 3,4-DAP doses will cost about $100-120 from a compounding pharmacy, and that a substantial portion of compounding pharmacies will have it. Plaintiffs' independent research confirms CW 1's estimate.[5]

### d.  Relevant FDA regulations

52.    FDA regulations provide special incentives to encourage manufacturers to develop orphan drugs. The FDA's regulations on clinical trials are also relevant.

### i.  Orphan drugs

53.    Orphan drugs are drugs that treat diseases affecting fewer than 200,000 persons in the U.S.

54.    Most prominently, the first manufacturer to obtain FDA's marketing approval receives 7 years of market exclusivity, even if the manufacturer has no patent protection from competition.

55.    But the FDA will also provide funding for clinical research to test the drug's safety and efficacy, exempt the manufacturer from paying applicable user fees, permit surrogate endpoints (i.e., lets the manufacturer show efficacy through endpoint that are not themselves the target outcome but that are correlated with it), and provide tax credits.

### ii.  FDA clinical trials

56.    Before approving a drug, the FDA requires that a manufacturer prove its safety and efficacy in one or more pivotal clinical trials.

57.    Ordinarily, drug manufacturers will conduct clinical trials in two phases, called Phase II and Phase III. In Phase II, the manufacturer will conduct a clinical trial on a relatively

---

[5] Plaintiffs called 14 randomly selected compounding pharmacies in rural and urban areas. Five had the drug. Patients obtained prices from three compounding pharmacies; the price per dose ranged from about $1.00 to about $2.40.

small population consisting of hundreds of patients; on Phase III, the manufacturer will conduct a clinical trial on a larger population consisting of thousands of patients.

58.     There is, however, no statutory requirement that a manufacturer conduct two clinical trials. Indeed, 21 CFR § 312.21 Phases of an investigation provides, "The clinical investigation of a previously untested drug is generally divided into three phases. Although in general the phases are conducted sequentially, they may overlap."

59.     The FDA is specifically "required to exercise its scientific judgment to determine the kind and quantity of data and information an applicant is required to provide for a particular drug to meet the statutory standards." 21 CFR § 314.015. The FDA's Rare Diseases Program at the Office of New Drugs, a part of the Center for Drug Evaluation and Research ("CDER"), has specifically indicated to manufacturers that it may exercise its discretion to determine that one study is adequate, i.e. a Phase II trial may be a pivotal clinical trial sufficient to obtain FDA approval. Rare Diseases Clinical Development, Presentation to public workshop on Investigational New Drug (IND) Process, October 18, 2010, Slide 27 (available at <http://www.fda.gov/downloads/Drugs/NewsEvents/UCM227865.pdf>.)

60.     Nancy Chew, a regulatory expert consulted by Plaintiffs, has guided six orphan drugs through FDA approval process. All six clinical programs were allowed to go forward, with only one pivotal clinical trial. And Ms. Chew's experience is typical; in a presentation to the FDA's Advisory Committee, Anne Pariser of the Rare Diseases Program Garnett of the FDA's Office of Clinical Pharmacology, stated that most orphan drugs have been approved through

"unique and non-traditional levels" of evidence such as "Single trial + other evidence supporting application".[6]

61.     Indeed, Catalyst itself has recognized that a single Phase II clinical trial may be sufficient for an orphan drug's approval:

> Generally, the process of seeking approval of an NDA requires multiple clinical trials, including two "pivotal" U.S. Phase III clinical trials. In our case, because CPP-109 is intended to treat a serious condition for which there is no approved therapy, there is a possibility that if the data from the Phase II(b) Trial is sufficiently compelling, that the FDA will allow us to file an NDA for CPP-109 on the basis of this trial, when combined with the data from the previous clinical trials and studies of vigabatrin to treat addiction. However, it is more likely that the FDA will require a Phase III trial supported by the safety and efficacy data obtained from our Phase II(b) clinical trial before they will allow us to file an NDA for CPP-109, even if the data from our currently ongoing Phase II(b) clinical trial are compelling. Further, even if the FDA permits us to file an NDA based on our current Phase II(b) trial or only one "pivotal" U.S. Phase III trial, it is unlikely that we will submit an NDA for CPP-109 for at least two years. Finally, if the FDA requires more than one Phase III clinical trial, our NDA submission would be delayed even further. There can be no assurance that the data from our ongoing Phase II(b) Trial will be sufficiently compelling or that even if such data are sufficiently compelling, that the FDA will allow us to file an NDA based on the results of that trial.[7]

62.     Nor is the designation "Phase II" or "Phase III" determined by the FDA. Rather, the *manufacturer* selects the designation, and only in some instances negotiates the phase with the FDA. There is no statutory requirement that requires the manufacturer to designate a trial "Phase II" unless it already has had a Phase II trial. Here, for example, BioMarin and Catalyst call their Pivotal Clinical Trial "Phase III", though it is the first clinical trial on LEMS that they have conducted.

### e.   *Jacobus and Catalyst's clinical trials*

63.     Jacobus has been manufacturing and distributing 3,4-DAP for about 20 years. Jacobus initially sought to develop 3,4-DAP to gain marketing approval it. In 1997, the FDA

---

[6] Page 148-149, available at <
https://www.google.com/#q=lawrence+j.+lesko+fda+advisory+committee>.
[7] Catalyst Pharmaceutical Partners, Inc., Form 10-K for the year ended December 31, 2010, at 9.

specifically encouraged Jacobus to open a single clinical trial and file a New Drug Application ("NDA") to obtain marketing approval for 3,4-DAP. FDA told Jacobus it would accept its NDA even if it only conducted one pivotal clinical trial.

64.     BioMarin started a pivotal clinical trial for Firdapse in June, 2011 (the "Firdapse Clinical                Trial").               BioMarin             designated             its             trial "Phase III". Jacobus opened its own pivotal clinical trial for 3,4-DAP in January 2012 (the "3,4-DAP Clinical Trial"). Jacobus designated its trial "Phase II".

65.     Despite their different designations, the two trials are broadly similar:

   a.  Both have an estimated enrollment of 30 patients;

   b.  Both are estimated to be competed in Q2, 2014, with the 3,4-DAP Clinical Trial estimated to be completed in April 2014, and the Firdapse Clinical Trial in June 2014;

   c.  Both drugs have an orphan designation, with 3,4-DAP's designation dated December 18, 1990, and Firdapse's November 12, 2009;

   d.  Both are double blind and randomized;

   e.  Both are pivotal clinical trials upon which each respective company intends to file an application for FDA approval.

66.     Because there are very few persons with LEMS, recruitment of enough patients to conduct a clinical study is a critical concern. Thus, LEMS patients themselves have a significant ability to determine whether Jacobus's or Catalyst's trial meets its expected completion date.

67.     CW 1, who has LEMS, explains that he and the small LEMS community are terrified at the possibility of Catalyst's drug being approved, stating that "we are fighting for our lives out here," that "a lot of LEMS patients are really concerned about what's going on with

15

Catalyst," and that "I tell them that it behooves them to get into the Jacobus clinical trial." In contrast, Jacobus has been supplying 3,4-DAP to the LEMS community for twenty years, and Catalyst currently supplies about 200 patients. Thus, many LEMS patients believe, like CW 1, that "David and Laura Jacobus are the most magnificent people in the world. They're caring people who want to make a living but are not out to screw anybody."

68.     These LEMS patients are concerned that if Catalyst obtains FDA approval for Firdapse, it will raise the price for treatment dramatically making the drug too expensive for them to obtain treatment, as BioMarin did in the UK.[8]

69.     Indeed, on August 16, 2013, Wikipedia's 3,4-DAP page was quietly amended to provide a message to LEMS patients:

> 3.4 DAP has been provided free of charge for in excess of 12 years by Jacobus Pharmaceutical of New Jersey through Orphan Drug Status which requires careful monitoring by the prescribing physician. Jacobus is involved in clinical trials to receive FDA approval before the company mentioned above (BioMarin) which has charged exorbitant amounts for its version of 3, 4 DAP (Firdapse) which, if it differs at all from the Jacobus DAP, only differs in adding a stability component. ***Anyone considering participating in a clinical trial for BioMarin (now out-licensed to Catalyst Pharmaceutical Partners, Inc. in the US) should review materials about BioMarin's pricing in the global market and Jacobus' past generous behavior before deciding to join the BioMarin clinical trials rather than the Jacobus ones.***[9]

[Emphasis added].

70.     Because Catalyst and Jacobus are each conducting only one small single pivotal clinical trial, they will be required to provide other evidence to satisfy the FDA that they have adequate evidence for the safety and efficacy of their product. Jacobus has already run several

---

[8] See, e.g., An Open letter to the Rt Hon David Cameron, Prime Minister and the Rt Hon Andrew Lansley, Secretary of State for Health (noting that many patients' drug costs are not funded and the drug is thus unavailable).

[9] The statement no longer appears on Wikipedia's page, but can be accessed by finding Wikipedia's 3,4-Diaminopyridine page at < http://en.wikipedia.org/wiki/3,4-Diaminopyridine>, selecting "View history," and selecting "17:39 16 August 2013", or through <http://en.wikipedia.org/w/index.php?title=3,4-Diaminopyridine&oldid=568825565>.

trials, and has been providing 3,4-DAP to patients for twenty years, and thus has amassed a sizeable amount of technical study data that is not available to Catalyst.

### f. *Catalyst*

71.     Catalyst was founded in 2002; Defendant McEnany was its co-founder, Chairman, President, and Chief Executive Officer.

72.     Since inception, Catalyst has earned a total of $488,958 in revenues – from a government grant. Its operating costs through December 31, 2012, were $44,970,596, and its net operating loss was thus $44,491,638 at that time. Catalyst has relied entirely on outside funding to stay afloat.

73.     Catalyst initially sought to develop two drugs to treat cocaine addiction, and thus branded itself as "a specialty company focused on the development and commercialization of prescription drugs for the treatment of addiction."[10]

74.     Catalyst's then-lead drug CPP-109 – one of the two – failed several Phase II FDA trials before Q2 2010. That quarter, Catalyst announced that it was conducting yet another trial for CPP-109.

75.     On June 18, 2012, Catalyst received notification from the NASDAQ that its stock would be stricken unless it could raise its stock price above the $1.00 minimum bid price requirement for ten consecutive days. If Catalyst is unable to list on the NASDAQ, its stock becomes sufficiently less liquid and thus much more difficult to sell; hence, investors would be less interested in buying Catalyst's stock, and even if Catalyst were able to raise funds, it would

---

[10] Catalyst Pharmaceutical Partners, Inc., Form 10-K for the year ended December 31, 2006, at 1, available at < http://www.sec.gov/Archives/edgar/data/1369568/000095014407002985/g06394e10vk.htm>.

not be able to obtain them on good terms. Since Catalyst has never sold even a dollar's worth of its drugs, if it cannot sell its stock or otherwise obtain outside funding, it will fail.

76.     Then, in July 2012, Catalyst announced that it would report the results of the CPP-105 clinical trial in 2012, rather than its initially scheduled date of Q3 2013. Catalyst's stock price quickly doubled from its close of $0.64 the previous day. On August 3, 2012, Catalyst announced that it had regained compliance with the NASDAQ's minimum bid requirement, and on August 28, 2012, Catalyst sold $6,000,000 of its stock.

77.     On October 26, 2012, Catalyst acquired from BioMarin the right to seek approval FDA approval for, and then market and sell, Firdapse in the U.S. The agreement also provided that BioMarin would collaborate with Catalyst in completing the Phase III trial, and also invest $5,000,000 to obtain Catalyst shares at a conversion price of 0.9 times Catalyst's stock price 30 days after it announced the results of its ongoing CPP-109 clinical trial. Catalyst announced the agreement on October 31, 2012.

78.     A week later, on November 8, Catalyst announced that its CPP-109 Phase II(b) clinical trials had failed. Catalyst's stock price collapsed from $1.45 to 0.50 that day, and on December 24, the NADSAQ told Catalyst that because its stock price had again fallen below $1.00, it would once again require Catalyst to bring its stock price up above $1.00 for ten consecutive business days. The NASDAQ gave Catalyst 180 days, or until June 24, to do so.

79.     With CPP-109 effectively dead, a NASDAQ deadline to meet, and failure looming if it was not met, Catalyst reinvented itself.

80.     In a presentation to an investor conference on February 11, 2013, Catalyst announced that it was "focused on the development and commercialization of prescription drugs targeting rare (orphan) neurological diseases and disorders."

18

81. This radically changes its focus. Its 2011 10-K, for example, had provided:

Catalyst Pharmaceutical Partners, Inc. is a development-stage specialty pharmaceutical company focused on the development and commercialization of prescription drugs targeting diseases and disorders of the central nervous system with a focus on the treatment of addiction and epilepsy.

82. But Catalyst's 2012 10-K thus provided, first among its reports to shareholders, that:

We are a development-stage pharmaceutical company focused on the development and commercialization of novel prescription drugs targeting (rare) orphan neuromuscular diseases and disorders.

83. And in the same 10-K, Catalyst announced that its strategy now centered on Firdapse:

Our goal is to develop and commercialize novel prescription drugs targeting rare (orphan) neurological diseases, neuromuscular diseases and disorders of the central nervous system. Specifically we intend to:

- Pursue Firdapse for LEMS. Enrollment in the Phase III clinical trial evaluating Firdapse for the treatment of LEMS is ongoing, and we expect to report top-line results from the double-blind portion of this clinical trial during the second quarter of 2014. Assuming success in the Phase III trial, we intend to file an NDA for Firdapse in the first quarter of 2015 and, although there can be no assurance, we anticipate that under those circumstances we may obtain approval from the FDA of such NDA by the end of 2015. If approved on this timeline, we would hope to commercially launch this product for the treatment of LEMS sometime in the first half of 2016.

- Seek additional CNS orphan drug indications for Firdapse. We believe that Firdapse may also be an effective treatment for other central nervous system orphan indications such as Congenital Myasthenic Syndrome and Myasthenia Gravis. Subject to the availability of funding, we hope to pursue the necessary clinical and pre-clinical trials and studies to support applications to the FDA for approval to market Firdapse for these additional indications.

84. Between issuing its 10-K on March 27, 2013, and the beginning of the Class Period on August 27, 2013, Catalyst issued three press releases announcing its earnings. Each touted Firdapse.

85.     In that time, Catalyst also issued a press release concerning Firdapse and placed a new presentation on its website.

86.     On April 18, an analyst from Aegis Capital issued a report advising clients to buy Catalyst's stock, and fixing a price target of $2.50. The report based its recommendation on Firdapse. On April 18 and 19, Catalyst's stock price nearly doubled from $0.47 to $0.88.

87.     On June 24, 2013, Catalyst's deadline to meet the NASDAQ's $1.00 minimum bid price requirement elapsed. On June 25, the NASDAQ gave Catalyst a 180 day extension; Catalyst was required to have a minimum bid of over $1.00 for ten consecutive days by December 23, 2013.

88.     On June 25, 2013, Catalyst announced that it had been granted a 180 day extension to regain compliance with NASDAQ listing rules. Catalyst was ordered to ensure that its stock price closed above at least $1.00 per share for at least ten consecutive trading days by December 23, 2013.

89.     On August 2, 2013, Catalyst regained compliance with the NASDAQ's minimum bid price rule.

## IV.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS
## MADE DURING THE CLASS PERIOD.

90.     The Class Period begins on August 27, 2013, when Catalyst issued a press release which made false and misleading statements about Firdapse:

**Catalyst Pharmaceutical Partners Receives Breakthrough Therapy Designation From FDA For Firdapse™ For The Treatment of LEMS**

**CORAL GABLES, FL, August 27, 2013** — Catalyst Pharmaceutical Partners, Inc. (Nasdaq: CPRX), a specialty pharmaceutical company focused on the development and commercialization of novel prescription drugs targeting rare (orphan) neuromuscular and

neurological diseases, today announced that its investigational product Firdapse™ (amifampridine phosphate) has received "Breakthrough Therapy Designation" by the U.S. Food and Drug Administration (FDA) for the symptomatic treatment of patients with Lambert-Eaton Myasthenic Syndrome (LEMS). Firdapse™ is Catalyst's investigational therapy that is being evaluated for the treatment of the debilitating symptoms associated with LEMS, including muscle weakness.

"We are very pleased to have received Breakthrough Therapy Designation for Firdapse™ and we are excited by the FDA's decision to place our product in a category that may enable expedited development and review for patients with LEMS," said Patrick McEnany, President and Chief Executive Officer of Catalyst. "***With no*** approved ***or effective symptomatic treatment currently available for LEMS,*** Firdapse™ has the potential to be the first-line treatment option for patients with this rare condition."

Breakthrough Therapy Designation for Firdapse™ was based on clinical data from several previously published clinical trials of amifampridine (3,4-DAP) in patients with LEMS. Firdapse™ has the potential to provide significant relief of the often debilitating symptoms of the disease, including muscle weakness (e.g. difficulty walking), difficulty swallowing and talking, drooping of eyelids and facial weakness.

[...]

**<u>About LEMS</u>**

Lambert-Eaton Myasthenic Syndrome, LEMS, is a rare autoimmune disease that can be severely disabling, with the primary symptom of muscle weakness. The weakness is generally more marked in the proximal muscles, particularly of the legs and trunk. Other problems include reduced reflexes, drooping of the eyelids, facial weakness and problems with swallowing. Patients often report dry mouth, impotence, constipation and feelings of light headedness on standing. These problems can be life threatening when the weakness involves respiratory muscles. The muscle weakness in LEMS is caused by autoantibodies to voltage gated calcium channels, which cause a reduction in the amount of acetylcholine released from nerve terminals. ***The prevalence of LEMS is estimated at approximately 3,000 patients in the United States and Canada.*** Approximately 50 percent of LEMS patients diagnosed have small cell lung cancer. Patients with LEMS typically present with fatigue, muscle pain and stiffness. A diagnosis of LEMS is generally made on the basis of clinical symptoms, electromyographic and compound muscle action potential (CMAP) testing and where available, the presence of autoantibodies against voltage gated calcium channel.

91.     The statement that there was "no [...] effective treatment for LEMS" was false

because there *was* an effective treatment: taking 3,4-DAP, obtained through Jacobus or a

compounding pharmacy. Virtually all patients who sought 3,4-DAP obtained it, and received an effective treatment for LEMS.

92.     The statement that "[t]he prevalence of LEMS is estimated at approximately 3,000 patients in the United States and Canada" was false or misleading, because most mainstream estimates placed LEMS's prevalence as *at most* 5 persons per million, which would give a total of between about 805 and 1750 for the U.S. and Canada combined.

93.     When it acquired Firdapse's U.S. rights from BioMarin, Catalyst disclosed the source of its 3,000 patient estimate as "Orphanet and the British Medical Journal estimate the prevalence of LEMS at 1 per 100,000 in population,"[11] using this number and the U.S.'s population to arrive at an estimate of 3,150 for the U.S. The Orphanet page is attached as Exhibit 1 and incorporated by reference; it provides two different prevalence estimates in two different places – 1-9 per 100,000, and 3-4 per 1,000,000. Indeed, this outlier Catalyst has built its business on appears to have been from a section mistakenly pasted into the wrong article by Orphanet. The 1-9/100,000 appears in a section of the page that also incorrectly provides that the age of onset for LEMS is "Adolescence / Young adulthood." The 3-4/1,000,000 estimate appears in a section which provides, correctly, that "age of onset is typically over 40 years old." The British Medical Journal estimate – attached as Exhibit 2 and incorporated by reference – is an un-cited statement from the discussion section of a *case report of a single case* by a treating physician. It was reckless of Defendants to rely on such sources when they contradicted the rest of the literature.

---

[11] Catalyst Pharmaceutical Partners, Inc., Regulation F-D Disclosure, available at < http://www.sec.gov/Archives/edgar/data/1369568/000119312512446123/d432332dex991.htm>.

94.     On August 27, 2013, Catalyst's stock price rose from $1.42 to $2.01 on heavy volume.

95.     The next day, on August 28, 2013, Catalyst received proceeds of $1,378,000 by selling 1,297,500 shares of common stock upon the exercise of outstanding warrants.

96.     Also on August 28, Catalyst entered into a new contract with Defendant McEnany. The contract provided for a three year extension on McEnany's contract, so that it extended to November 8, 2016. The contract paid McEnany $386,859 in base salary in 2012; even without a raise, the contract extension provides McEnany with $1,160,577 over three years. Mr. McEnany is also owed his annual salary if he is terminated without cause, and $773,718 if there is a change in control.

97.     Alicia Grande, Catalyst's Vice President, Treasurer, and Chief Financial Officer signed for Catalyst. Ms. Grande has been employed by Catalyst since 2003, and was paid $278,409 in total compensation in 2012.

98.     As of August 2013, Catalyst had an effective registration statement on Form S-3. Form S-3 permit issuers to engage in "shelf offerings," so called because they allow an issuer to register stock and then sell the stock at a later date. Thus, to conduct a public offering, Catalyst did not need to obtain SEC approval of its registration statement, a time consuming, uncertain, and iterative process; it could just immediately file a prospectus and sell the stock at an opportune time.

99.     On September 4, 2013, Catalyst added $2,612,336 of its stock to its Registration Statement on Form S-3.

100.    On September 5, 2013, Catalyst filed a prospectus to sell $15,136,000 of its stock, with proceeds to Catalyst. The prospectus contained false statements:

In January of 2012, another pharmaceutical company began its own *Phase II trial* studying their own formulation of amifampridine for the treatment of LEMS. While there can be no assurance we believe that Firdapse is *further along in development* and as a result we expect that we will be in a position to file an NDA first for amifampridine phosphate.

101.    The statement was false because Catalyst had no reason to think it was ahead of Jacobus in conducting its pivotal clinical trial. Jacobus had access to the multiple clinical trials it had run in the 1990's, which BioMarin itself relied upon in obtaining approval for Firdapse. BioMarin had even attempted to buy Jacobus's technical data. Catalyst did not speak with Jacobus to determine whether it was behind Catalyst before making the statement in its SEC filings. The statement is also misleading in stating that Jacobus was on Phase II trials. For an orphan drug, a company often needs only to conduct one pivotal clinical trial. Indeed, neither Catalyst nor BioMarin had conducted any clinical trials on Firdapse prior to its Phase III trials. Rather, the company itself determines whether to label its pivotal trial a "Phase II" or "Phase III" trial. Thus, to say that Jacobus is conducting "Phase II trials" means no more than that though Jacobus decided to call its pivotal clinical trial a Phase II trial, Catalyst decided to call its pivotal trial a Phase III trial. Both trials are pivotal trials and, if successful, may serve as sufficient basis for an application for FDA approval.

102.    The registration statement provided, under Use of Proceeds:

We expect that the net proceeds from this offering will be approximately $14.1 million, after deducting placement agent fees and estimated offering expenses payable by us. We expect to use the net proceeds from this offering: (i) to fund our product development efforts for Firdapse, and (ii) for general corporate purposes.

103.    On September 10, 2013, Catalyst issued a press release, advising investors that the offering had closed, and that the purpose of the offering was to obtain funds to develop Firdapse:

Patrick J. McEnany, Catalyst's Chairman and CEO, stated: "We are pleased to have completed this financing, which we believe, along with the proceeds from recent warrant exercises, gives us the capital necessary to fund development of Firdapse™ and allows us to begin new clinical studies for CPP-115."

104.    On October 8, 2013, Catalyst made a presentation to the 12th Annual BIO Investor Forum. It also placed its presentation materials on its website.

105.    The presentation was delivered in part by Defendant McEnany, and listed his email address as the sole contact information for Catalyst.

106.    The presentation contained false statements:

a.  Slide 5 provides that the U.S. prevalence of LEMS was more than 3,000 patients, which was false and misleading because the total prevalence in the U.S. was less than 1750 and approximately 1,000. The statement was also reckless because Catalyst had not conducted any further study of LEMS's prevalence since August 27, 2013, when it claimed that the total prevalence for the U.S. *and* Canada was *about* 3,000; thus, the U.S. population *alone* could hardly be *more* than 3,000. The statement that there are more than 3,000 patients in the U.S. alone is repeated in Slide 17.

b.  Slide 10 of the presentation is attached as Exhibit 3 and is incorporated by reference. Slide 10 falsely states that (1) LEMS Treatment is not adequate; and (2) an effective treatment would relieve symptoms, increase mobility, and prevent shortening of life from immobility complications, which Firdapse does. The statements are false and misleading because there is an effective treatment for LEMS: 3,4-DAP.

c.  Slide 10 also falsely state that only 5-10% of patients with LEMS can obtain 3,4-DAP from compounding pharmacies. It does not disclose that Jacobus provides

3,4-DAP for free to patients. The statement is thus false and misleading because between Jacobus and compounding pharmacies, virtually 100% of patients who have LEMS can obtain 3,4-DAP, rather than only 5-10%.

    d.   Slides 5, 13, 15, and 19 touted that Firdapse was on its Phase III trials, which is misleading because it had conducted no Phase II trials of Firdapse and the Phase III label was one that had been artificially imposed by Catalyst and BioMarin themselves.

107.    The presentation also falsely stated that Firdapse had a $100 million market opportunity in North America. The estimate was drawn from Catalyst's earlier estimate of the U.S. as having 3,150 patients.

108.    And in a slide discussing "Firdapse[] data for EU Approval Establishes Safety & Efficacy in LEMS," Firdapse cited three studies of 3,4-DAP, but none of Firdapse.

109.    On October 15, 2013, Catalyst filed with the SEC a report on Form 8-k which announced the proceeds it had raised from its false and misleading claims about Firdapse:

- Between August 19, 2013 and September 3, 2012 [sic], the Company issued an aggregate of 2,623,049 shares of its authorized but unissued common stock upon the exercise of previously issued common stock purchase warrants, raising gross proceeds from such warrant exercises of approximately $2,757,000 [of which at least $1,378,000 were obtained from shares exercised on August 28, 2013]

- On September 10, 2013, the Company closed a registered direct public offering of 8,800,000 shares of its authorized but unissued common stock, raising gross proceeds of approximately $15.1 million; and

- Between September 11, 1013 [sic] and October 8, 2013, the Company issued an aggregate of 1,239,201 shares of its authorized but unissued common stock upon the exercise of previously issued common stock purchase warrants, raising gross proceeds from such warrant exercises of approximately $1,327,000.

110.    Thus, Catalyst's class period proceeds from selling its stock were at least $17.8 million – two million dollars more than Catalyst's total operating costs and expenses for 2010-2012.

## V.    ADAM FEUERSTEIN REVEALS THAT CATALYST HAD BEEN PROVIDING PATIENTS WITH 3,4-DAP FOR TWENTY YEARS WITHOUT CHARGE, AND CATALYST'S STOCK PRICE FALLS 42%.

111.    On October 18, 2013, journalist Adam Feuerstein published an article showing that (1) Catalyst's statement that there was no effective treatment for LEMS, and (2) Catalyst's claim that it was ahead of Jacobus were false:

> **Catalyst Pharmaceuticals Partners** (CPRX ) is considered an orphan drug stock because that's the story management spins. Dig deeper into Catalyst and you'll discover allegations of profiteering off a small group of vulnerable, sick patients and a ton of clinical and regulatory risk.
>
> Investors have fallen in love with orphan drug stocks this year because the business model prints money. **Aegerion Pharmaceuticals** (AEGR ), **Alexion Pharmaceuticals** (ALXN ), **NPS Pharmaceuticals** (NPSP ) and others develop drugs for serious and rare diseases afflicting small numbers of patients. In exchange for spending the time and money to develop drugs for diseases that might ordinarily be ignored, these companies get to charge sky-high prices -- $400,000 or more in some cases. Insurance companies generally pick up the tab without complaints because there are so few patients who need these expensive drugs.
>
> There are a lot of great orphan drug companies. I mentioned some above. But there are also some companies who will take shortcuts or push the orphan drug formula too far. Catalyst fits into the latter category.
>
> The company's lead drug candidate is Firdapse for the treatment of Lambert-Eaton Myasthenic Syndrome (LEMS) -- a rare, neuromuscular disease which causes progressive muscle weakness. Untreated, LEMS patients -- usually in their 40s or 50s -- lose mobility and suffer other complications which can lead to

shortened life expectancy. About half of LEMS diagnoses are associated with small cell lung cancer, the rest from autoimmune disease.

There are only a few thousand LEMS patients in the U.S. so the disease qualifies for orphan status. Firdapse is already approved in Europe where it is marketed by **BioMarin Pharmaceuticals** (BMRN_). Catalyst licensed Firdapse from BioMarin for the U.S. market. The drug is not FDA approved here, so Catalyst is conducting a phase III study in LEMS patients (BioMarin started the study, Catalyst took it over) with top-line results expected in the middle of 2014. If the Firdapse study is positive (high odds, see Europe), Catalyst plans to submit the drug for U.S. approval in 2015 and start selling it in 2016.

The company has not disclosed Firdapse pricing, but some analysts guesstimate a price tag exceeding $60,000 per year. Even with "moderate" orphan drug pricing, Firdapse could generate $200-500 million in peak sales, the company claims. [This includes treating another 2,000 patients or so with rare diseases similar to LEMS.]

This "We're an orphan drug company, too!" pitch that Catalyst makes to investors has been effective. The stock's performance this year is stellar:

There is another, troubling side to the Catalyst story.

For the past 20 years, **Jacobus Pharmaceuticals**, a small, private, family-owned pharmaceutical company in New Jersey, has provided LEMS patients in the U.S. (and some in Europe) with an effective drug known as 3,4-Dap free of charge.

Let me repeat: Jacobus gives away 3,4-Dap to LEMS patients FOR FREE!

One more thing: 3,4-Dap is Firdapse. The two drugs are equivalent. The same. Even Catalyst acknowledges that 3,4-Dap is an effective treatment for LEMS.

In other words, Catalyst is developing Firdapse for LEMS and will likely charge U.S. patients more than $60,000 per year even though the same drug is already available to U.S LEMS patients for free.

You can understand why Catalyst doesn't like to discuss this part of the story.

I had the chance to speak with David and Laura Jacobus, the father-daughter team who run Jacobus Pharmaceuticals. The company was founded by David Jacobus in 1977. Today, it sells a couple of drugs in addition to manufacturing and

28

supplying 3,4-Dap to LEMS patients through numerous compassionate use programs set up at leading academic medical centers like Duke, Cleveland Clinic and the Mayo Clinic.

3,4-Dap has been around for decades but has never been formally reviewed or approved by the FDA. As Laura Jacobus tells the story, 20-odd years ago, the Muscular Dystrophy Association approached her father about manufacturing 3,4-Dap. At that time, doctors were interested in studying 3,4-Dap as a promising treatment for LEMS but a reliable, high-quality supply of the drug was unavailable.

Jacobus agreed to manufacture 3,4-Dap at the MDA's request. In the ensuing decades, the company has built an efficient and trusted relationship with LEMS patients and their doctors. LEMS patients in need of treatment are referred to medical centers with investigator-sponsored IND programs, also known as expanded access or compassionate use programs. [A couple of examples can be found here and here.] Paperwork is filled out and submitted to the FDA, which grants the doctor permission to treat the LEMS patient with 3,4-Dap .

Once FDA approval is granted, Jacobus is notified and 3,4-Dap is shipped to the doctor free of charge.

"We have a great relationship with the FDA. Before he retired, Rusty Katz used to call me personally to give the okay for these compassionate use cases," said David Jacobus. [Katz was the head of the FDA division which reviews and regulates neurologic drugs.]

Why supply 3,4-Dap for free? Why not get the drug approved and charge patients for access?

"Because supplying the drug for free is the right thing to do," said Laura Jacobus. "My father believed, and we still believe, that we have a moral responsibility to support this fragile patient population and not to profit from them. A lot of people believe the government or the insurance companies will support these patients and pay for their drug but at the end of the day, we all pay for it."

David and Laura Jacobus aren't socialists. They have no problem with companies developing novel drugs to treat disease and making money selling them. But that's not what Catalyst is doing with Firdapse in the U.S. or what BioMarin has done with the drug in Europe, Laura Jacobus says.

29

"Firdapse is not a new compound. It's the same drug we make. What Catalyst is doing is not the same as a company profiting from a new invention. What Catalyst is doing is making money off LEMS patients. They don't want to help LEMS patients, they just want to make money. If I worked for Catalyst, I wouldn't be able to sleep at night," she says.

Jacobus is working to stop Catalyst from gaining FDA approval for Firdapse. After years of supplying 3,4-Dap for free through compassionate use programs, Jacobus decided to conduct its own clinical trial with the intent of getting the drug formally approved by the FDA.

The Jacobus pivotal study of 3,4-Dap in LEMS patients is underway, competing directly with Catalyst's Firdapse study.

Laura Jacobus wouldn't disclose how many patients are enrolled to date but said enrollment is going "very well" and the study is "getting close to the end." The company's long relationship with U.S. doctors who treat LEMS patients has helped greatly, she added. [The Wikipedia entry for 3,4-Dap even encourages LEMS patients not to enroll in Catalyst's Firdapse study.]

[All emphases in original].

112.    As a result in the disclosures in Mr. Feuerstein's article, on October 18, Catalyst's stock price fell from $2.61 to $1.90 on heavy volume. On October 21, the next trading day, Catalyst's stock price fell from $1.90 to $1.52, again on heavy volume, damaging investors. In total, Catalyst's stock price fell $1.09, or 42%.

## VI.    PLAINTIFFS' CLASS ACTION ALLEGATIONS

113.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Catalyst securities during the Class Period (the "Class"); and were damaged thereby. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal

representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

114.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Catalyst securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified through appropriate discovery or identified from records maintained by Catalyst or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

115.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

116.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

117.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

   a.   whether the federal securities laws were violated by defendants' acts as alleged herein;

   b.   whether statements made by defendants to the investing public during the Class

31

Period misrepresented material facts about the business, operations and management of Catalyst;

c.   whether McEnany caused Catalyst to issue false and misleading financial statements during the Class Period;

d.   whether defendants acted knowingly or recklessly in issuing false and misleading statements;

e.   whether the prices of Catalyst securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

f.   whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

118.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

119.    Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), to the extent Defendants are charged with material omissions.

120.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. As a regulated issuer, Catalyst filed periodic public reports with the SEC. Catalyst Power met the requirements for listing, and was actively traded on the NASDAQ, under ticker CPRX;

b. On average, 16.28 million shares of Catalyst stock were traded on a weekly basis during the Class Period.  According to the Company's third quarter 2013 10-Q there were 54.1 million shares of Catalyst stock outstanding.  Thus, approximately 30% of Catalyst outstanding shares were bought and sold on a weekly basis, demonstrating a *very strong* presumption of an efficient market.

c. CPRX regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

d. CPRX was eligible to and did file short-form registration statements with the SEC on Form S-3, and sold stock pursuant to this Form S-3.

e. CPRX was followed by numerous analysts that issued reports about it.

f. New company specific information was rapidly reflected in the Company's stock price.

g. At least twenty firms made a market in the Company's stock.

121.   Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## VII.   COUNT I

**For Violations of §10(b) of the Exchange Act and Rule 10b-5**
**Against all Defendants**

122.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

123.    This Count is asserted against all defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule l0b-5 promulgated thereunder.

124.    During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Catalyst securities; and (iii) cause Plaintiffs and other members of the Class to purchase Catalyst securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

125.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Catalyst securities. Such reports, filings, releases and

statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Catalyst's finances and business prospects.

126.    By virtue of their positions at Catalyst, McEnany had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth in that he failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to him. Said acts and omissions of defendant were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

127.    Information showing that defendants acted knowingly or with reckless disregard or the truth is peculiarly within defendants' knowledge and control. As a senior manager of Catalyst, McEnany had knowledge of the details of Catalyst internal affairs.

128.    McEnany is liable both directly and indirectly for the wrongs complained of herein. Because of his position of control and authority, he was able to and did, directly or indirectly, control the content of the statements of Catalyst. As an officer and director of a publicly-held company, McEnany had a duty to disseminate timely, accurate, and truthful information with respect to Catalyst's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Catalyst securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Catalyst's business and financial condition which were concealed by defendants, Plaintiffs and the other members of the Class purchased Catalyst securities at artificially inflated prices and relied upon

the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

129.    During the Class Period, Catalyst securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Catalyst securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiffs and the Class, the true value of Catalyst securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Catalyst securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

130.    By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

131.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against Defendant McEnany

132.    Plaintiffs repeat and reallege each and every allegation contained in  the foregoing paragraphs as if fully set forth herein.

133.    During the Class Period, McEnany participated in the operation and management of Catalyst, and conducted and participated, directly and indirectly, in the conduct of Catalyst's business affairs. Because of his senior position, he knew the adverse non-public information about Catalyst's false statements.

134.    As Catalyst's President, CEO, and Chair of its Board, McEnany had a duty to disseminate accurate and truthful information with respect to Catalyst's false statements, and to correct promptly any public statements issued by Catalyst which had become materially false or misleading.

135.    Because of his position of control and authority as a senior officer, McEnany was able to, and did, control the contents of the various reports, press releases and public filings which Catalyst disseminated in the marketplace during the Class Period concerning Catalyst's activities. Throughout the Class Period, McEnany exercised his power and authority to cause Catalyst to engage in the wrongful acts complained of herein. McEnany therefore, was a "controlling person" of Catalyst within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Catalyst securities.

136.    McEnany, therefore, acted as a controlling person of Catalyst. By reason of his senior management position and directorship of Catalyst, McEnany had the power to direct the

actions of, and exercised the same to cause, Catalyst to engage in the unlawful acts and conduct complained of herein. McEnany exercised control over the general operations of Catalyst and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

137.    By reason of the above conduct, McEnany is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Catalyst.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(a)  Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

(b)  Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 23, 2014                    Respectfully submitted,

                                           **THE ROSEN LAW FIRM, P.A.**

                                           /s/ Laurence M. Rosen
                                           Laurence M. Rosen, Esq, Fla. Bar # 0182877
                                           275 Madison Avenue, 34th Floor
                                           New York, NY  10016
                                           Phone: (212) 686-1060
                                           Fax: (212) 202-3827

                                           Counsel for Plaintiff