`

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 13-23878-CIV-UU
Judge: Hon. Ursula Ungaro

LUIS ARANAZ and JARED PEREIRA, individually, and on behalf of all others similarly situated,

    Plaintiffs,

    vs.

CATALYST PHARMACEUTICAL PARTNERS INC., and PATRICK J. MCENANY
    Defendants.

**CLASS REPRESENTATIVES' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; MEMORANDUM OF LAW IN SUPPORT**

**MOTION**

Luis Vizcay Aranaz and Jared Pereira (collectively "Class Representatives" or "Lead Plaintiffs"), upon the accompanying Memorandum of Law and the accompanying Declaration of Laurence Rosen In Support of Final Approval of Class Action and An Award of Attorneys' Fees and Reimbursement of Expenses ("Rosen Dec.") and the exhibits attached thereto, hereby move the Court pursuant to Fed. R. Civ. P. 23(e) for final approval of the Settlement of this action for $3,500,000 and the Plan of Allocation. The Settlement and Plan of Allocation are fair, reasonable, and adequate and should be approved by the Court.

The Proposed Judgment will be submitted with Plaintiffs' reply papers, which is after the deadline for opting out of Settlement.

**MEMORANDUM OF LAW**

**I.    PRELIMINARY STATEMENT**

The Settlement was reached only after Class Representatives, among other things: (a) investigated the facts and law of claims against Catalyst; (b) drafted their initial, amended, and operative second amended complaint; (c) defeated Defendants' motions to dismiss; (d) engaged in extensive document discovery and reviewed over 50,000 pages of documents; (e) took, defended, or attended 7 depositions, including their own; (f) certified a class; (g) attended hearings in five sets of discovery motions filed in this case; (h) prepared a mediation statement and participated in an all-day mediation with Jed Melnick in Miami; and (i) negotiated the specific terms of the Settlement. *See* Rosen Dec., ¶8

The Settlement is an excellent result. The Settlement returns 23.5% of Class Representatives' best-case scenario of damages, *i.e.*, Class Representatives prevail on all claims and appeals, every class member puts in a claim, no class members are excluded because they are Excluded Persons or because the presumption of reliance is rebutted in their case, and the entire drop on both the day of the corrective disclosure and the next trading day is attributed to Defendants' alleged fraud. *See* Rosen Dec., ¶4. This percentage of recovery is more than double the median for similar securities class action settlements. Cornerstone, Securities Class Action Settlements 2013 Review and Analysis, at 9 (in cases with estimated damages of less than $50 million, median settlement between 1996-2012 returned 10.7% of estimated damages) ("Cornerstone Report"). The Settlement also returns all of Defendants' remaining insurance

1

coverage. *See* Rosen Dec., ¶20. Litigation is rapidly depleting Defendants' insurance policy below the $3.5 million level.

Pursuant to the Court's Preliminary Approval Order, over 10,199 notice and claim packets were mailed to potential Settlement Class Members and nominees. *See* Declaration of Josephine Bravata Concerning The Mailing of The Notice Of Pendency and Proposed Settlement of Class Action and Proof of Claim and Release Form attached as Exhibit 1 to the Rosen Declaration ("Bravata Dec."). ¶6. To date, no objections or requests for exclusion have been submitted. *Id.,* at ¶¶10-11. The deadline to object is March 2, and to seek exclusion is February 23. *Id.*

The Settlement results from arm's-length negotiations among the Settling Parties, that began in the summer of 2014 and continued through an all-day mediation with skilled mediator Jed Melnick, Esq. The negotiations culminated in the Settlement after further negotiations conducted with Mr. Melnick's assistance.

For these reasons and those set forth below, Class Representatives respectfully submit that the Court should approve the Settlement because it is fair, reasonable and adequate.

II.     **FACTS**

    **A. Liability**

Catalyst Pharmaceutical Partners, Inc., is a small pharmaceutical company with one product near FDA approval: Firdapse. Firdapse is designed to treat Lambert-Eaton Myasthenic Syndrome ("LEMS"). LEMS is a terrible disease that fortunately only afflicts between about 200 and 3,000 patients in the U.S. Defendant Patrick McEnany is Catalyst's founder and CEO.

Drugs that treat disease afflicting fewer than 200,000 persons in the United States qualify for "orphan drug status". This designation grants a variety of benefits to the drug's proponent, the most important of which is seven years' marketing exclusivity for the first company to push a drug through to approval regardless of patent. Catalyst sought and obtained orphan drug status for Firdapse.

For the last twenty years, Jacobus Pharmaceutical Company, Inc., has been offering 3,4-DAP to qualified LEMS patients for free. 3,4-DAP is as effective as Firdapse. In fact, Firdapse just is 3,4-DAP, slightly modified to allow storage at room temperature rather than in a refrigerator.

On August 27, 2013, Catalyst published a press release announcing that Firdapse had received Breakthrough Therapy Designation from the FDA, entitling Catalyst to certain benefits. The August 27 press release stated that there was "no approved or effective treatment currently available for LEMS". Class Representatives allege that this statement was false because there was an effective treatment for LEMS that was available to any LEMS patient who could obtain the FDA's approval for his or her individual use: 3,4-DAP. Defendants maintain the statement was not false because at the time, the FDA had not approved 3,4-DAP *for marketing*. Rosen Dec. ¶ 21. That day, Catalyst's stock price increased by $0.59, or 42%.

The parties dispute whether, if the statement was false, it was made with *scienter*. Class Representatives point to the extensive due diligence on Jacobus that Catalyst had conducted prior to acquiring the U.S. rights to Firdapse in October 2012. Rosen Dec. ¶ 22. Indeed, Defendants do not appear to dispute that they learned before the Class Period that Jacobus had been offering 3,4-DAP to at least some U.S. LEMS patients for a long time. For their part, Defendants point out that in an email sent in November 2012, Catalyst's CEO admitted to an analyst that Jacobus had been offering 3,4-DAP to LEMS patients. Rosen Dec. ¶ 23. Accordingly, Defendants maintain that if Class Representatives are correct and the statement in the August 27 press release is false, they were at most negligent rather than severely reckless. Dkt. # 127, at 12-13.

On August 29, 2013, obscure analyst firm H.C. Wainwright & Co. published an analyst report (the "Wainwright Report") providing that, among other things, 3,4-DAP was "provided through compassionate distribution through Jacobus." Dkt. # 94-1, at ¶33. The Wainwright Report was, among other things, not published on H.C. Wainwright's website, because it didn't have one. Defendants argue that the Wainwright Report placed the truth concerning Jacobus on the market; Class Representatives maintain that the Wainwright Report did not claim that 3,4-DAP was effective, and that even if it had, the Wainwright Report does not match the intensity and credibility of Defendants' own statements and those of other third parties. Dkt. # 98, at 6-7, (*citing Kaplan v. Rose*, 49 F.3d 1363, 1377 (9th Cir. 1994)). The Court held that it could not adjudicate Defendants' truth-on-the-market argument at class certification, and intimated that "proving an absence of price impact seems exceedingly difficult." *Aranaz v. Catalyst Pharm. Partners Inc.*, 302 F.R.D. 657, 673 (S.D. Fla. 2014). But ultimately, it is the jury that would resolve this battle-of-the-experts, and this is but one of the many ways Defendants could obtain a complete defense verdict.

3

On October 18, 2013, investigative journalist Adam Feuerstein published an expose on Catalyst. Over October 18 and the next trading day, Catalyst's stock price fell by 42% - strikingly, the same percentage it had increased following the August 27 press release. Class Representatives maintain that Mr. Feuerstein's expose revealed that Jacobus had been offering 3,4-DAP to U.S. LEMS patients for free for twenty years, and that it was this revelation that caused Catalyst's stock price to plummet. Defendants claim that Mr. Feuerstein's expose did not reveal anything, but instead was bad publicity and presaged more bad publicity to come.[1] Dkt. # 94-1, at ¶¶ 68-69.

### B. Procedural history

#### 1. Pleadings

This action was filed in October 2013. The Court appointed Messrs. Vizcay Aranaz and Pereira as lead plaintiffs, and granted Defendants' motion to dismiss, in January 2014. Lead Plaintiffs then filed their Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Amended Complaint"), Dkt. # 23, which Defendants moved to dismiss, dkt. # 29. The Court swiftly ruled on Defendants' motion, dismissing four of the five statements Class Representatives alleged were false and misleading, but holding that they had adequately alleged a claim as to Defendants' statement that there was "no approved or effective treatment currently available for LEMS". *Sood v. Catalyst Pharm. Partners Inc.*, No. 13-CV-23878-UU, 2014 WL 1245271, at *2, 9 (S.D. Fla. Mar. 26, 2014).

#### 2. Class Certification

Class Representatives filed their motion for class certification twenty days after the Supreme Court decided *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2405 (2014). Halliburton held that investors could continue to invoke the fraud-on-the-market presumption of reliance. *Id.* at 2407. This presumption was the only plausible class certification theory Class Representatives had available to them. As discussed above, Defendants argued that a class should not be certified because they had established their truth-on-the-market defense; the Court held that they could not raise it at class certification while intimating that in its view the defense was weak. The Court thus granted Class Representatives' motion for class certification. Dkt. # 120.

---

[1] Like many investigative journalists, Mr. Feuerstein frequently returns to his previous investigative subjects.

*3. Discovery*

The Private Securities Litigation Reform Act (the "PSLRA") stays discovery until the court upholds the plaintiffs' complaint. Discovery began shortly after the Court's opinion upholding in part the Amended Complaint. By the time of the mediation, Class Representatives had reviewed 50,000 pages of documents, appeared for seven depositions throughout the country, appeared before Judge Otazo-Reyes on five sets of discovery motions, obtained responses to their interrogatories (and also responded to Defendants'), and served requests for admission. Rosen Dec. ¶ 11. Class Representatives had also prepared for the forthcoming depositions of Defendants Catalyst and McEnany, and Catalyst's CFO Alicia Grande and head of regulatory affairs Douglas Winship. Indeed, without divulging confidential details, the mediation focused on very specific facts, individual documents, and testimony obtained in discovery. Class Representatives thus had a sufficient understanding of the case to negotiate a very favorable settlement.

## III. THE COURT SHOULD FINALLY CERTIFY THE CLASS

A necessary part of the settlement process for class actions is the certification of the class before or at the time the settlement is approved by the court. It is widely recognized that a class action is a particularly appropriate mechanism for individual shareholders to obtain recovery in cases of alleged federal securities laws violations. *See, e.g., Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) (class actions allow "[P]laintiffs to pool claims which would be uneconomical to litigate individually …[M]ost of the [P]laintiffs would have no realistic day in court if a class action were not available"). The Court previously certified a Class in this action. Dkt. # 120. Because nothing has occurred since then to cast doubt on whether the applicable prerequisites of Rule 23 are met, the Court should now finally certify the Class.

## IV. THE SETTLEMENT SHOULD BE FINALLY APPROVED

### A. Standards

There is a "strong judicial policy favoring settlement." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). "[S]ettlements [of class actions] are 'highly favored in the law and will be upheld whenever possible.'" *Bennett v. Behring Corp.*, 96 F.R.D. 343, 348 (S.D. Fla. 1982), *aff'd*, 737 F.2d 982 (11th Cir. 1984); *accord In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992); *Ass'n for Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 466 (S.D. Fla. 2002). As the court in *U.S. Oil & Gas* noted:

5

> Complex litigation – like the instant [class action] case – can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive. Accordingly, the Federal Rules of Civil Procedure authorize district courts to facilitate settlements . . . .

967 F.2d at 493.

In approving a settlement under Federal Rule of Civil Procedure 23(e), the district court must find that it "is fair, adequate and reasonable and is not the product of collusion between the parties." *Bennett*, 737 F.2d at 986 (internal quotations omitted). "The Court [must] make a two part determination that: 1) there is no fraud or collusion in reaching the settlement, and 2) the settlement is fair, adequate and reasonable." *Warren v. City of Tampa*, 693 F. Supp. 1051, 1054 (M.D. Fla. 1988) *aff'd,* 893 F.2d 347 (11th Cir. 1989). Approval of a class action settlement, including application of the foregoing factors, "is committed to the sound discretion of the district court." *U.S. Oil & Gas*, 967 F.2d at 493; *Bennett*, 737 F.2d at 987

The Eleventh Circuit has held that in determining whether a proposed settlement is "fair, adequate and reasonable," a court should look to the following *Bennett* factors:

> (1) the likelihood of success at trial; (2) the range of possible recovery, and the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (3) the complexity, expense and duration of litigation; (4) the substance and amount of opposition to the settlement; and (5) the stage of proceedings at which the settlement was achieved.

*Bennett*, 737 F.2d at 986; *accord Cifuentes v. Regions Bank*, No. 11 CV 23455 FAM, 2014 WL 1153772, at *4 (S.D. Fla. Mar. 20, 2014).

Finally, in evaluating a settlement, the court "is entitled to rely upon the judgment of experienced counsel for the parties." *Canupp v. Sheldon*, No. 204-CV-260-FTM-99DNF, 2009 WL 4042928, at *5 (M.D. Fla. Nov. 23, 2009) (*quoting Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)); *see also Warren*, 693 F. Supp. at 1060 (in approving settlement of class action, "[t]he Court is affording great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation"). Indeed, in reviewing a settlement under Rule 23, "the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977); *accord In re Smith*, 926 F.2d 1027, 1028 (11th Cir. 1991).

### B. The Settlement is Fair, Adequate, and Reasonable Under the *Bennett* Factors

#### 1. Likelihood of success at trial

The first *Bennett* factor is "the likelihood of success at trial." *Bennett*, 737 F.2d at 986. This is the most important factor and is weighed against the relief proposed by the settlement. *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1323 (S.D. Fla. 2007) (internal quotations omitted). This factor favors settlement so long as there is substantial doubt about the Class's ability to prevail at trial. *See Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 693 (S.D. Fla. 2014) (mere fact of potential loss at trial weighed in favor of settlement); *Behrens*, 118 F.R.D. at 540 (approving class action settlement because "[i]f the plaintiff pursued this cause through trial, the likelihood of achieving any success would be at risk"); *see Beavers v. Am. Cast Iron Pipe Co.*, 164 F. Supp. 2d 1290, 1298 (N.D. Ala. 2001) ("There are both strengths and weaknesses in each party's position[;] [t]his uncertainty of outcome is another factor favoring approval of the settlement.")

Plaintiffs must prove every element of their cause of action and negate every affirmative defense to recover. And to be entitled to their maximum damages, the figure this brief uses as its reference point, Class Representatives must make every factual showing demanded by their theory of the case. But if plaintiffs are like Tolstoy's happy families, which must all be alike in winning on every issue, defendants are like unhappy families, all unlike each other because they only need to win on one issue. Thus, if there are numerous issues on which the jury could go either way, a plaintiff's likelihood of success on the merits is not about even; it is close to zero.

This case, though not quite as bleak, presents many such issues. As discussed above, Defendants would argue at trial that their statement was literally true and not misleading, because 3,4-DAP was not approved by the FDA for marketing. Though Class Representatives do not believe the jury would agree with Defendants, it might.

Securities fraud actions, because they demand that plaintiffs show not just negligence but at least severe recklessness, are difficult to prove at trial. *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1330 (S.D. Fla. 2001). Defendants would have argued that they did not make false statements with *scienter*, pointing to Catalyst's CEO's pre-Class Period statement to an analyst acknowledging Jacobus's existence. Dkt. # 127, at 12-13. Again, Class Representatives do not believe that the jury would agree with Defendants, but it might.

As discussed above, Defendants would have argued that the truth that Jacobus-manufactured 3,4-DAP was widely available was on the market Whether truth was on the market would be resolved by expert testimony, and it is notoriously hard to predict whose expert the jury

7

would believe. *See, e.g., Zuckerman v. Smart Choice Auto Group, Inc.*, 2001 WL 686879, at *10 (M.D. Fla. May 3, 2001) ("The determination of damages, like the determination of liability, is a complicated and uncertain process, typically involving conflicting expert opinions."); *Behrens*, 118 F.R.D. at 542 ("In the battle of experts, 'it is virtually impossible to predict with certainty which testimony will be credited.'"). Class Representatives do not believe the jury would agree with Defendants on either of these issues, but it might.

On damages, Defendants would argue that the Class's losses were caused by the bad publicity of Mr. Feuerstein's article rather than any revelation of fraud contained therein. *Aranaz*, 302 F.R.D. at 671. Defendants' expert testified that the entirety of the drop is attributable to bad publicity, but even if the jury did not completely agree with her, it might attribute some of the drop to this non-fraud factor. It might also agree with Defendants' expert that the market overreacted to the news, further reducing damages. And if Class Representatives' expert could not establish that the drop on October 21 was caused by Defendants' false statements,[2] damages would drop to $12.7 million, with the settlement returning 27.6% of those damages.

Thus, Defendants have many different ways to win available to them. 23.5% of maximum estimated damages is a very handsome recovery. This factor weighs in favor of approval.

### 2. Considering the Range of Possible Recovery, the Settlement Is Clearly Within the Range of Reasonableness

The second and third factors, which are usually combined, require the Court to determine the possible range of recovery and then determine the minimum fair, reasonable, and adequate settlement within that range. *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1322 (S.D. Fla. 2005). The Court must evaluate the settlement "in light of the attendant risks with litigation." *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1350 (S.D. Fla. 2011) (internal quotations omitted). Settlement, courts in this district emphasize, is compromise, and requires "an abandoning of highest hopes." *Id.* (internal quotations omitted).

As discussed above, Class Representatives' damages expert concluded that their "best case" damages recovery is 23.5%. Defendants have disputed Class Representatives' damages estimates and, under their analysis, assert Class-wide damages to be zero, or at least much less.

---

[2] Notably, Catalyst's stock price fell from $2.61 to $1.90 on October 18, then to $1.52 on October 21, but returned to $1.82 on October 22, and stayed at or above that price until October 28. Thus, the fall on October 18 was short-lived.

8

Rosen Dec. ¶ 19. The Settlement is an excellent recovery, returning more than double the average settlement in cases of this size. Cornerstone Report, at 9; *In re Rite Aid Corp. Sec. Litig.*, 146 F.Supp.2d 706, 715 (E.D. Pa. 2001) (noting that since 1995, class action settlements have typically recovered "between 5.5% and 6.2% of the class members' estimated losses.").

Additionally, the Settlement provides for payment to Class Members now, without delay, and not some wholly-speculative payment of a hypothetically-larger amount years down the road. "[M]uch of the value of a settlement lies in the ability to make funds available promptly." *In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1396, 1405 (E.D.N.Y. 1985). Moreover, the Settlement represents a recovery to Class Members of substantially all of Defendants' remaining insurance coverage. Notably, Defendants held a wasting insurance policy that would be substantially depleted or gone after trial and Defendants' inevitable post-trial motions and appeal.

Thus, this factor favors approval.

### 3. The Complexity, Expense, and Likely Duration of Continued Litigation

"A securities case, by its very nature, is a complex animal." *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 164 (S.D.N.Y. 2011) (internal quotations omitted). Further, complex class actions are "notably difficult and notoriously uncertain." *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12-CIV-8557 CM, 2014 WL 7323417, at *3 (S.D.N.Y. Dec. 19, 2014) (internal quotations omitted). The Court should take into account the significant burden this case would impose on it should it go to trial. *Ressler v. Jacobson*, 822 F. Supp. 1551, 1554 (M.D. Fla. 1992).

As discussed above, this case had its share of complexity and expense.[3] In addition, however, this case also involved complex and costly expert testimony. Class Representatives had retained a financial expert, who would testify on market efficiency, loss causation, and Defendants' truth-on-the-market defense. Class Representatives also retained a regulatory expert, necessary to parse Defendants' statement that there was "no approved or effective treatment available for LEMS" and to convey to the jury the regulatory scheme and biotechnology practices that made the statement false. Rosen Dec. ¶ 17. Defendants had retained a financial expert and informed Class Representatives that they would retain a regulatory expert, each of

---

[3] The two-week trial in this case was set to begin on March 4, 2015, which is extremely quick for a securities class actions. Post-trial motions and appeals would likely have consumed far more time, but in light of the tight litigation schedule, duration does not especially favor approval

9

whom would testify on the same subjects as Class Representatives' corresponding expert. By negotiating low fee agreements and seeking only necessary work, Class Representatives have kept expenses thus far to about $167,000. But in Class Counsel's experience, even preparing the case for trial would cost more than $400,000. *Vinh Nguyen v. Radient Pharm. Corp.*, No. SACV 11-00406 DOC, 2014 WL 1802293, at *8 (C.D. Cal. May 6, 2014) (in similar case where Rosen Law Firm was lead counsel, settled weeks before trial, class counsel sought reimbursement of litigation costs of about $420,000).

This factor favors approval.

#### 4. The Reaction of the Class

The reaction of class members to a proposed settlement is a significant factor to be considered and the absence of objections "is excellent evidence of the settlement's fairness and adequacy." *Ressler*, 822 F. Supp. at 1556; *Access Now, Inc. v. Claire's Stores, Inc.*, No. 00-14017-CIV, 2002 WL 1162422, at *7 (S.D. Fla. May 7, 2002) ("[t]he fact that no objections have been filed strongly favors approval of the settlement").

Over 10,123 notice claim packets were mailed to potential Class Members and nominees. *See* Bravata Dec. ¶6. The Notice apprised Settlement Class Members of their right to object to the Settlement, the Plan of Allocation, or to Lead Counsel's application for attorneys' fees and expenses, and the procedure to object or seek exclusion. *Id.* at Ex. A. To date, there have been no objections to Lead Counsel's request for expenses. *Id.* at ¶10. The deadline to object is March 2, 2015. *Id.* Nor have any Class Members opted out of the Settlement. *Id.* at ¶9. The deadline to opt out is February 23, 2015. *Id.*

#### 5. The Stage of Proceedings

The purpose of considering the stage of the proceedings is to ensure that plaintiffs had sufficient information to evaluate the case and to determine the adequacy of the settlement. *Behrens*, 118 F.R.D. at 544. "The law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations." *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1349 (S.D. Fla. 2011) (*quoting Ressler*, 822 F. Supp. at 1555).

Here Class Representatives had sufficient understanding of the strengths and weaknesses of their case. Class Representatives obtained a decision on Defendants' motion to dismiss and their own motion for class certification. They reviewed over 50,000 pages of documents,

consulted with regulatory and financial experts, took, defended, or attended 7 depositions, including the crucial depositions of BioMarin and Jacobus, and attended an all-day mediation session with a well-regarded mediator. *See* Rosen Dec. ¶8. The parties also discussed the evidence, setting out their positions on what it showed.

Thus, this factor favors approval. *See Sunbeam*, 176 F. Supp. 2d at 1332 (because "case had progressed to a point where each side was well aware of the other side's position and the merits thereof[,] [t]his factor weighs in favor of the Court finding the proposed settlement to be fair, adequate, and reasonable"); *Behrens*, 118 F.R.D. at 544.

### C. Negotiations were conducted at arm's length and the Settlement is not the result of fraud or collusion

"[C]ourts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered." *Newberg on Class Actions,* § 11.51 at 11.88 (4th ed. 1992). This was no quick settlement. The parties conducted months of discovery, with Defendants representing to this Court that by October 1, 2014, they had spent more than $500,000 reviewing documents for production. Djt. # 127, at 5. Judge Otazo-Reyes specifically remarked that this was a hard-fought case, and the parties appeared before her on five sets of motions. Class Representatives filed three complaints and one proposed complaint attached to a motion for leave to amend; two drew motions to dismiss, one a motion to strike, and the fourth an opposition to the motion for leave to amend. The parties obtained a decision on class certification, and Defendants had even filed a petition to appeal shortly before settlement was reached.

Settlement negotiations began in the summer of 2014, and the parties had not reached a settlement after a nine hour mediation before an impartial mediator. Class Counsel represent that the negotiations were at arm's-length at all times. Indeed, all parties attended the mediation.

Thus, there was no fraud or collusion, and negotiations were at arm's length; the Court should approve the settlement. *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1345 (S.D. Fla. 2011).

### D. The Recommendation of Experienced Counsel Favors Approval of the Settlement

11

The Court is entitled to rely on the judgment of counsel, and, indeed, "'should be hesitant to substitute its own judgment for that of counsel.'" *Id.* at 539 (quoting *Cotton*, 559 F.2d at 1330); *accord In re Smith*, 926 F.2d 1027, 1028 (11th Cir. 1991); *Strube*, 226 F.R.D. at 703. Lead Counsel strongly endorses the Settlement. As the court held in *Strube*, "[Class] counsel's informed recommendation of the agreement is persuasive that approval is appropriate." *Id* at 703. I, the undersigned, Laurence M. Rosen, Class Representatives' Lead Counsel, represent to this Court that based on my having served as lead or co-lead counsel in over 40 successful securities class action, I believe the Settlement is fair-reasonable, and adequate. Rosen Dec. ¶ 24.

## IV.   THE PLAN OF ALLOCATION SHOULD BE APPROVED

The standard for approval of a plan of allocation is the same as the standard for approving a settlement: whether it is "fair, adequate and reasonable and is not the product of collusion between the parties." *In re Chicken Antitrust Litig. Am. Poultry,* 669 F.2d 228, 238 (5th Cir. 1982).

The Plan of Allocation was formulated with the aid of an experienced consultant. The Plan of Allocation was designed to reimburse class members to the extent of their damages under the securities laws. *See also In re Oracle Sec. Litig.*, 1994 WL 502054, at *1 (N.D. Cal. June 18, 1994) ("A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable"). After taking into account lack of loss causation and the timing of Class Members' stock purchases and sales, the Plan of Allocation does not discriminate between Class Members in the same position. The Net Cash Settlement Amount is distributed on a *pro rata* basis depending on Class Members' recognized losses. Accordingly, the Plan of Allocation is fair and adequate and should be approved.

## V.   CONCLUSION

For the reasons stated herein and in the Rosen Declaration, Plaintiffs respectfully request that the Court finally approve the proposed Settlement and Plan of Allocation as fair, reasonable, and adequate and enter the proposed Judgment.

Dated: February 16, 2015                     Respectfully submitted,

                                             **THE ROSEN LAW FIRM, P.A.**

   /s/ Laurence Rosen
Laurence M. Rosen
Fla. Bar No. 0182877
275 Madison Avenue, 34th Floor
New York, New York 10016
Phone: (212) 686-1060
Fax: (212) 202-3827

*Class Counsel*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, February 16, 2015 a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ Laurence Rosen