`

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 13-23878-CIV-UU
Judge: Hon. Ursula Ungaro

LUIS ARANAZ and JARED PEREIRA, individually, and on behalf of all others similarly situated,

    Plaintiffs,

    Vs.

CATALYST PHARMACEUTICAL PARTNERS INC., and PATRICK J. MCENANY,

    Defendants.

**CLASS REPRESENTATIVES' MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES; MEMORANDUM OF LAW IN SUPPORT**

**MOTION**

Luis Vizcay Aranaz and Jared Pereira (collectively "Class Representatives" or "Lead Plaintiffs"), upon the accompanying Memorandum of Law and the accompanying Declaration of Laurence Rosen In Support of Final Approval of Class Action Settlement and An Award of Attorneys' Fees and Reimbursement of Expenses ("Rosen Decl.") and the exhibits attached thereto, hereby move the Court pursuant to Fed. R. Civ. P. 23(e) for an Order: (1) awarding attorneys' fees in the amount of $1,166,667; (2) reimbursement of $167,658.54 in expenses that were incurred in prosecuting this action; and (3) an award of $10,000 each to Class Representatives.

A [Proposed] Order approving the requested award of attorneys' fees and expenses will be filed with Class Representatives' Reply in Further Support of this Motion.

**MEMORANDUM OF LAW**

**I.  PRELIMINARY STATEMENT**

The Class Representatives propose to settle this case for an immediate cash payment of $3.5 million. The Class Representatives now request a payment of attorneys' fees of one third of the settlement, or $1,166,666.67.

This was no easy case. Three actions were filed in the wake of an article by investigative journalist Adam Feuerstein raising questions about Catalyst's business practices. Two were voluntarily dismissed before Defendants filed a motion to dismiss. In securities class actions, the court must select a lead plaintiff and lead counsel. In the Court's *BankAtlantic* case, there were 6 different lead plaintiff movants, represented by a total of 8 different lead counsel applicants. Here, Lead Plaintiffs and Lead Counsel were the only movants. Other law firms did not want to invest the time and resources to prosecute such a difficult and risky case.

This action was hard-fought. Class Representatives filed three complaints, and opposed two motions to dismiss. The Settlement was only reached after the Court denied Defendants' motion to dismiss, and certified a class. By the time of the Settlement, discovery was nearly complete. The parties appeared before Judge Otazo-Reyes on five different sets of discovery motions.

The result is exceptional. Class Representatives' damages expert, making numerous optimistic assumptions, estimates that if the Class won on every point at trial, damages could

1

reach as high as $14.9 million. Thus, the Settlement recovers 23.5% of the maximum conceivable damages – against a median of 10.7% in cases with similar damages.

The Class supports the result. To date, there have been no objections from Class Members, either to the settlement itself or to the amount of attorneys' fees. No Class Members have opted out of the Settlement.

This is a meritorious action that returns to class members far more than the typical class action. The case was so difficult that had Lead Counsel not pursued it, no other firm would have. Courts in this district awarded either 30% or $33^{1/3}$% in the last five securities class action settlements they approved. In light of the trying circumstances and the necessity of awarding sufficient fees to encourage meritorious lawsuits like this one to be filed and pursued, Class Representatives respectfully request that the Court pick the higher of the two, and grant an award of one third of the Gross Settlement Fund.

Class Representatives also request reimbursement of Class Counsel's actual litigation expenses in the amount of $167,658.54. These expenses are reasonable, and are of the kind that attorneys usually expense to their clients.

In the Eleventh Circuit, and throughout the Nation, class representatives are often granted service awards from the settlement to compensate them for their time and the risks incurred. Class Representatives request service awards of $10,000 each. Notably, both Class Representatives spent a day and a half preparing for and providing deposition testimony. In addition, Mr. Pereira traveled from Texas to Miami for the mediation. Mr. Vizcay Aranaz flew to Miami from Madrid – twice, once for his deposition, and the second for the mediation. Both Class Representatives have shown diligence and dedication to this case and have made personal sacrifices for the Class, which now benefits from their efforts.

**II.     Class Counsel's efforts for the Class.**

From the beginning, this Action was hard-fought. It was filed by Class Counsel on October 25, 2013. (Dkt. # 1). Shortly thereafter, two substantially identical actions were filed against Catalyst.[1] Both were dismissed before the defendants filed a motion to dismiss.

In December 2013, the defendants moved to dismiss the complaint. (Dkt. # 10). Also that month, Class Representatives and Ward Rijnsburger[2] moved to be appointed as lead plaintiffs.

---

[1] *Vizcay v. Catalyst Pharmaceutical Partners, Inc.*, 13-cv-24162-UU (S.D. Fla.) and *Daigle v. Catalyst Pharmaceutical Partners, Inc.*, 13-cv-24264 (S.D. Fla.)

2

(Dkt. # 13). There were no other movants, and after a hearing taking place on January 3, 2014, the Court granted their motion. (Dkt. # 22). At that hearing, the Court also granted the defendants' motion to dismiss, but with leave to amend. (*Id.*)

That January, Class Representatives filed their Amended Class Action Complaint For Violations of the Federal Securities Laws (the "Amended Complaint"). (Dkt. # 23). In drafting the Amended Complaint, Class Representatives, among other things, consulted with a regulatory expert, spoke with many LEMS patients, spoke at length with the reclusive principals of Jacobus Pharmaceutical Co., Inc., reviewed Catalyst's extensive SEC filings and other publicly available information about it, and reviewed the extensive literature on LEMS. (Rosen Dec. ¶10). On March 26, the Court granted in part and denied in part the Defendants' motion to dismiss the Amended Complaint. (Dkt. # 39). The Court's order found that four of five of the alleged misrepresentations were not actionable. *Sood v. Catalyst Pharm. Partners Inc.*, No. 13-CV-23878-UU, 2014 WL 1245271, at *5 (S.D. Fla. Mar. 26, 2014). Thereafter, Class Representatives filed their Second Amended Complaint for Violations of the Securities Laws (the "Second Amended Complaint") reflecting the Court's March 26 order, which was the operative complaint in this Action.

The parties then began discovery. Discovery in this case, though conducted professionally, was heavily contested. Class Representatives served and responded to comprehensive requests for production. The parties resolved many discovery disputes, and substantially narrowed many more. (Rosen Dec. ¶11). But they nonetheless required a hearing and resolution from Judge Otazo-Reyes on several issues, including: (1) the specific provisions of a protective order regarding confidentiality, dkt. # 62; (2) Class Representatives' and Defendants' initial requests for production and interrogatories, dkt. # 87; (3) Class Representatives' and Defendants' respective requests for protective orders prohibiting depositions, dkt. # 112, 123; (4) Class Representatives' motion to compel amendment of discovery responses pursuant to Federal Rule of Civil Procedure 26(e) and to compel production of documents whose existence only became apparent through discovery, dkt # 123; and (5) Class Representatives' motion to modify the protective order in this case, dkt. # 139. Indeed, Judge Otazo-Reyes remarked that discovery in this case was appropriately hard-fought.

---

[2] Mr. Rijnsburger later moved to withdraw as lead plaintiff.

3

Meanwhile, Class Representatives filed their motion for class certification. Class Representatives relied on the efficient market presumption of reliance. Pursuant to the Court's order, dkt. # 49, the motion was filed twenty days after a landmark Supreme Court decision that could have outright eliminated this presumption, *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014). Class Representatives' motion was one of the first filed after *Halliburton*, and thus necessarily raised novel questions. Defendants took Class Representatives' depositions. Mr. Vizcay-Aranaz flew from Madrid to Miami for his, while Mr. Pereira's was taken in Texas because shortly before his scheduled deposition his wife suffered a potentially crippling injury that required Mr. Periera to stay at home and care for her and their son.[3] (Pereira Dec. ¶4). Defendants' opposition to Class Representatives' motion to certify relied on the declaration of their expert, Lucy Allen. Class Representatives took her deposition on her first available date, Friday, August 15, and filed their reply in support of class certification the next Monday, August 18. Dkt. # 97. The Court's opinion granting class certification, similarly painting on a fresh canvass, was the first to hold that *Halliburton* does not permit a defendant to rebut the presumption of reliance at class certification through a truth-on-the-market defense, as Class Representatives urged. *Aranaz v. Catalyst Pharm. Partners Inc.*, 302 F.R.D. 657, 671 (S.D. Fla. 2014). The Court's correct holding was echoed by every court that has considered the issue since, all of whom cited the Court's opinion. *Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Fin. Corp.*, No. CV 10-J-2847-S, 2014 WL 6661918, at *8 (N.D. Ala. Nov. 19, 2014); *In re Bridgepoint Educ., Inc. Sec. Litig.*, No. 12-CV-1737 JM JLB, 2015 WL 224631, at *7 (S.D. Cal. Jan. 15, 2015). Defendants moved for permission to appeal the Court's order granting class certification. *Catalyst Pharmaceutical Partners, Inc. v. Aranaz*, 14-90021 (11th Cir.).[4]

Both during and after class certification, document discovery continued apace, with Class Representatives serving subpoenas on a variety of third-parties, including investment banks, analyst firms, Jacobus, and BioMarin Pharmaceutical, Inc., a partner of Catalyst. In September, merits depositions began in earnest. BioMarin's deposition took place in San Francisco, Jacobus's in Philadelphia, Allen's in Miami, and CW 1 and CW 2 in their home cities more than 1,500 miles from either Miami or New York City. In total, there were seven depositions taken in

---

[3] Mr. Pereira nonetheless continued to enthusiastically and superbly satisfy his obligations as Lead Plaintiff and Class Representative.

[4] Defendants' appeal is being held in abeyance pending final approval of the Settlement.

4

this case. Class Representatives also noticed and prepared for the depositions of Defendants Catalyst and McEnany, as well as Catalyst officers Alicia Grande and Douglas Winship, which were scheduled to take place shortly after the mediation. (Rosen Dec. ¶12).

After exchanging mediation briefs, all of the parties personally appeared for a mediation in Miami on October 20, 2014. Dkt. # 141. Shortly after the nine-hour mediation, the case settled for $3.5 million. (Rosen Dec. ¶14). Thereafter, the parties negotiated the Stipulation of Settlement, and Class Representatives drafted and filed their motion in support of preliminary approval of settlement.

## III. THE REQUESTED FEE AND EXPENSES ARE REASONABLE AND SHOULD BE APPROVED

### A. A Reasonable Percentage of the Fund Recovered Is the Appropriate Method for Awarding Attorneys' Fees in the Eleventh Circuit

Attorneys who achieve a benefit for class members in the form of a "common fund" are entitled to be compensated for their services from that settlement fund. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("[A] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole"); *see also Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 771 (11th Cir. 1991); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1358 (S.D. Fla. 2011). In the Eleventh Circuit, courts must determine the appropriate award to attorneys by granting them a percentage of the fund created through their efforts, dubbed the "percentage of the fund method". *Camden*, 946 F.2d at 774-75 ("the percentage of the fund approach is the better reasoned in a common fund case. . . [h]enceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class"). This approach is appropriate because it encourages counsel to obtain the maximum recovery for the class at the earliest possible stage of the litigation and, hence, most fairly correlates plaintiffs' counsel's compensation to the benefit achieved for the class. There is no "hard and fast" rule dictating what constitutes a reasonable percentage of the recovery to award "because the amount of any fee must be determined upon the facts of each case." *Camden*, 946 F.2d at 775.[5]

---

[5] In this regard, the Eleventh Circuit expressly noted that "an upper limit of 50% of the fund may be stated as a general rule, although even larger percentages have been awarded." *Id.* at 774-75.

5

### B. The Requested Fee is Reasonable Under the *Camden* factors

Under *Camden*, the court first fixes a benchmark, and then considers the so-called *Camden* factors to determine what constitutes a reasonable percentage award. *See Camden*, 946 F.2d at 773, 775. These factors include: (i) awards in similar cases; (ii) the time and labor required; (iii) the novelty and the difficulty of the questions; (iv) the skill requisite to perform the legal service properly, including the experience, reputation, and ability of the attorneys; (v) the preclusion of other employment by the attorney due to the acceptance of the case; (vi) the customary fee, including whether the fee is fixed or contingent; (vii) the amount involved and the results obtained; (viii) the "undesirability" of the case; and (ix) limitations imposed by the client or the circumstances; and (x) the nature and length of the professional relationship with the client.[6]

#### 1. Awards in similar cases

*Camden*, decided in 1991, suggested that an appropriate initial bench mark would be 25%, which courts should adjust up or down based on the specific facts of the cases. *Camden*, 946 F.2d at 775. But courts in securities class actions typically award higher percentages. In eight of the last nine orders awarding fees in securities class action settlements, courts have awarded attorneys' fees of either 30% or $33^{1/3}$%. *Howard v. Chanticleer Holdings, Inc.*, No. 12-cv-81123-JIC, dkt. # 74, at ¶4 (S.D. Fla. 2014) ($33^{1/3}$% of $850,000 fund); *Fuller v. Imperial Holdings*, 11-cv-81184-KAM, Dkt. # 95, at ¶17 (S.D. Fla. Dec. 16, 2013) (30% of $12 million fund); *Murdeshwar v. Searchmedia Holdings Ltd.*, 11-cv-20549, dkt # 103, at ¶14 (S.D. Fla. Apr. 25, 2012) ($33^{1/3}$% of $2.75 million fund); *Schorrig v. IBM Southeast Employees' Federal Credit Union*, 09-cv-80973-KLR, dkt. # 155, at *11 (S.D. Fla. Feb. 24, 2012) (30% of $950,000 fund); *City Pension Fund for Firefighters and Police Officers in the City of Miami Beach v. Aracruz Celulose S.A.*, 08-cv-23317-JAL, dkt. # 201, at ¶14 (S.D. Fla. July 17, 2013) ($33^{1/3}$% of $37.5 million fund); *Waterford Township General Employees Retirement System v. Bankunited Financial Corporation,* No. 08-cv-22572-MGC, dkt. # 164, at ¶11 (S.D. Fla. June 14, 2013) (30% of $3,000,000 fund); *Dance v. Levitt Corporation,* No. 08-cv-60111-DLG, dkt # 151, at ¶14 (S.D. Fla. Sep. 29, 2011) ($33^{1/3}$% of $1,948,050 fund); *Miller v. Dyadic International, Inc.,* No. 07-cv-80948-WPD, dkt, # 236, at ¶4 (S.D. Fla. July 28, 2010) ($33^{1/3}$% of $4,800,000 fund); *May v. Levy,* No. 07-cv-61333-PCH, dkt. # 68, at ¶13 (S.D. Fla. December 19, 2008) (25% of

---

[6] Class Counsel had no relationship with Class Representatives before this action.

$600,000 fund).[7] Securities class actions have some structural features that call for higher awards. For example, they are "highly complex",[8] require an extraordinary investment of time and resources and provide class members with hard cash rather than coupons.[9]

In a case similar to a securities class action, Judge Torres (in a report adopted by Judge Cohn) reflected on the factors that led him to grant an award of one third of the settlement fund, or $4,781,794.89. *Wolff v. Cash 4 Titles*, No. 03-22778-CIV, 2012 WL 5290155, at *4, *7 (S.D. Fla. Sept. 26, 2012) *report and recommendation adopted,* No. 03-22778-CIV, 2012 WL 5289628 (S.D. Fla. Oct. 25, 2012). There, a RICO case, counsel recovered 65% of investors' losses, or about 21.7% of total RICO damages, similar to the 23.5% recovery here. *Id.* at *1. Like in this case, "it was class counsel that bore alone the entire risk of this representation," including the risk of substantial unreimbursed expenses if they could not achieve a recovery. *Id.* at *1-2. And like in this case, "[p]erhaps the best objective test of the risk inherent in this litigation is the absence of any other attorneys willing to represent the class on a contingent fee basis," *id.* at *3, though here counsel issued the statutorily-mandated press release announcing the lawsuit and inviting other contenders. Here, as there, the Settlement is more valuable because it doesn't provide class members with vague non-monetary relief or coupons, but hard cash. *Id.* at *3. The *Wolff* case had its share of difficulties, such as the difficulty of pursuing foreign proceedings, but this one had as well: the difficulty of pursuing a class action even as the Supreme Court was considering in *Halliburton* whether to terminate the only plausible basis for certification; the difficulty of crafting novel arguments for class certification in light of *Halliburton*'s holding that evidence of lack of price impact may be used at class certification to rebut the presumption of reliance; the complex scientific and FDA regulatory issues; the obvious difficulty of the case that caused two of three initially-filed complaints to be withdrawn; and the difficulty of pursuing a case subject to the PSLRA without a restatement, a government investigation, or an admission of wrongdoing. Indeed, *Wolff* cited eight decisions from the Southern and Middle districts of

---

[7] *May v. Levy* was settled for a relatively small sum before the court decided the defendants' motion to dismiss.

[8] *In re Gen. Instrument Sec. Litig.*, 209 F. Supp. 2d 423, 433 (E.D. Pa. 2001); *In re Heritage Bond Litig.*, No. 02-ML-1475-DT(RCX), 2005 WL 1594389, at *12 (C.D. Cal. June 10, 2005).

[9] *In re AOL Time Warner, Inc. Sec.*, No. 02 CIV. 5575 (SWK), 2006 WL 3057232, at *10 (S.D.N.Y. Oct. 25, 2006); *In re Lease Oil Antitrust Litig. (No. II)*, 186 F.R.D. 403, 447 (S.D. Tex. 1999) (antitrust class action with cash payment).

Florida awarding 33% of the fund or more, and a further thirteen awarding between 30% and 33%. *Id.* at *6.

### 2. Time and Labor Required

Lead Counsel has devoted significant time and resources to researching, investigating, and prosecuting of this action. By the time the Settlement was reached, Lead Counsel had: (a) researched the law and the facts of the case; (b) retained a private investigator and an FDA regulatory and scientific consultant to assist in gathering facts and understanding the subject matter, (c) drafted the initial complaint, the first amended complaint, the operative second amended complaint, and the proposed third amended complaint; (d) defeated Defendants' motions to dismiss; (e) reviewed over 50,000 pages of documents produced by Defendants, reviewed hundreds of pages of documents produced by third parties, and produced hundreds of pages of documents; (f) took three depositions, defended two, and participated in two third-party depositions subpoenaed by Defendants; (g) certified a class; (h) prepared for depositions of Defendants and two of Catalyst's officers; (i) appeared before Judge Otazo-Reyes on five separate sets of discovery motions; (j) drafted a mediation statement and participated in an all-day mediation before Jed Melnick, Esq., in Miami. After the parties agreed on the dollar figure, they negotiated the Stipulation of Settlement, including the exhibits thereto, a difficult and taxing task.

Indeed, Class Counsel expended over 800 hours with a market value, or lodestar, of more than $460,000 at counsel's current billing rates, providing a multiplier of about 2.5.[10] *See* Rosen Decl., ¶26. While not required in the Eleventh Circuit, an analysis of the requested fee under the "lodestar/multiplier" approach further supports the reasonableness of an award of one-third of the Settlement Amount fee. *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1298 (11th Cir. 1999) ("while we have decided in this circuit that a lodestar calculation is not proper in common fund cases, we may refer to that figure for comparison"). The 2.5 multiplier requested

---

[10] The Supreme Court has held that the use of current rather than historical rates is appropriate in examining the lodestar because current rates more adequately compensate for inflation and the loss of use of funds. *See Missouri v. Jenkins by Agyei*, 491 U.S. 274, 283-84 (1989). Courts in this Circuit also have stated that it is appropriate to use counsel's current rates in order to compensate for the delay in payment and inflation. *See, e.g., Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534, 546 (S.D. Fla. 1988). Rates of The Rosen Law Firm, P.A. rates similar to those charged here were were approved in *Ray v. Lundstrom*, No. 4:10CV3177, 2012 WL 5458425 at * 4  (D. Neb. Nov. 8, 2012).

8

here is below the range of multipliers frequently awarded in class action settlements of similar magnitude in courts within the Eleventh Circuit. *See, e.g.*, *Pinto v. Princess Cruise Lines Ltd.,* 513 F. Supp. 2d 1334, 1344 (S.D. Fla. 2007) (noting that lodestar multipliers "'in large and complicated class actions' range from 2.26 to 4.5" and that "three appears to be the average"); *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 694-96 (N.D. Ga. 2001) (awarding fee representing a multiplier between 2.5 and 4); *Mashburn v. Nat'l Healthcare, Inc.,* 684 F. Supp. 679, 702 (M.D. Ala. 1988) ("A multiplier of approximately 3.1 in a national class action securities case is not unusual or unreasonable.").

As such, the time and labor expended justify the fee requested.

### 3. The Novelty and Difficulty of the Questions Involved

Class Representatives faced all the "multi-faceted and complex legal questions endemic" to cases based on alleged violations of federal securities law. *Ressler v. Jacobson*, 149 F.R.D. 651, 654 (M.D. Fla. 1992); *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1334 (S.D. Fla. 2001) (same). Moreover, "securities actions have become more difficult from a plaintiff's perspective in the wake of the PSLRA." *In re Sterling Fin. Corp. Sec. Class Action*, No. CIV.A. 07-2171, 2009 WL 2914363, at *4 (E.D. Pa. Sept. 10, 2009). This Action was no exception.

Both merits and class certification presented novel and difficult issues. As noted above, Class Representatives were among the first to move for class certification after *Halliburton*, and advanced an argument which, though rooted in the Supreme Court's prior case law, was unprecedented. On the merits, Class Representatives faced a strong truth-on-the-market defense at summary judgment and trial, in that certain analysts appear to have determined at least some of the facts about Jacobus before and during the Class Period.

Though Class Representatives survived in part Defendants' challenge to their Amended Complaint, the Court held that Class Representatives had stated a claim as to only one of the five charged misrepresentations. *Sood*, 2014 WL 1245271, at *5. The Court only left alive Class Representatives' claim that Defendants fraudulently stated that there was "no approved or effective treatment currently available for LEMS". *Id.* at *2, *7. Among other things, the Court held that Class Representatives had not alleged that Defendants fraudulently – rather than negligently – misled investors by stating that only 5-10% of LEMS patients obtained 3,4-DAP from compounding pharmacies without also disclosing that virtually all patients who wanted 3,4-DAP could obtain it.

9

At trial, Defendants would have argued that their statement was literally true and not misleading, because though LEMS patients can obtain Jacobus-manufactured 3,4-DAP, it has not been approved for marketing by the FDA, and a patient can only obtain it by specifically applying to the FDA under an expanded access program. (Rosen Dec. ¶ 21). Thus, Defendants would focus the jury's attention on the meaning of "available"; unable to point to a hard claim about the proportion of LEMS patients who actually receive 3,4-DAP, Class Representatives might not have been able to convince the jury that Defendants' statement was materially false.

In addition, securities class actions in general present difficult questions. For example, loss causation, damages, and market efficiency must all be established through expert testimony. Defendants would have presented their own expert, and the results of battles of the experts are notoriously difficult to predict. *City of Providence v. Aeropostale, Inc.*, No. 11 CIV. 7132 CM GWG, 2014 WL 1883494, at *9 (S.D.N.Y. May 9, 2014). Defendants need only win once; Class Representatives must win every single time.

### 4. The Skill Required to Perform the Legal Services Properly, and the Experience, Reputation, and Ability of the Attorneys

The quality of the representation by Class Counsel and the standing of Class Counsel are important factors that support the reasonableness of the requested fee. *See Ressler*, 149 F.R.D. at 654; *see also David v. Am. Suzuki Motor Corp.*, 2010 WL 1628362, at *8 n. 15 (S.D. Fla. Apr. 15, 2010) (a court should consider "the skill and acumen required to successfully investigate, file, litigate, and settle a complicated class action lawsuit such as this one"). Class Counsel has developed a reputation for zealous advocacy in relatively small securities class actions like this one. *Vinh Nguyen v. Radient Pharm. Corp.*, No. SACV 11-00406 DOC, 2014 WL 1802293, at *9 (C.D. Cal. May 6, 2014) (Rosen Law Firm "took on significant risk in this case, working thoroughly and enthusiastically through extensive litigation that required significant expert involvement"); *Pace v. Quintanilla*, No. SACV 14-2067-DOC, 2014 WL 4180766, at *3 (C.D. Cal. Aug. 19, 2014) ("Indeed, The Rosen Law Firm has appeared before this Court several times before, and the Court is confident that it has the necessary skill and knowledge to effectively prosecute this action"); *Bensley v. FalconStor Software, Inc.*, 277 F.R.D. 231, 242 (E.D.N.Y. 2011) ("As the court in *In re Fuwei Films Securities Litigation* concluded, based on the [Rosen Law] Firm's experience, 'the Rosen Law Firm is well-qualified to serve as lead counsel in this matter'"); *Howard v. Chanticleer Holdings, Inc.*, No. 12-81123-CIV, 2013 WL 104998, at *3

(S.D. Fla. Jan. 4, 2013) ("[T]he Rosen Firm is plainly qualified to serve as class counsel here"). Class Counsel's hard-won reputation allowed them to credibly threaten to take this case as far as it takes. A copy of Class Counsel's firm resume is appended to the Declaration of Laurence Rosen on Behalf of The Rosen Law Firm, P.A. Concerning Attorneys' Fees and Expenses (the "Rosen Fee Dec.")

Class Counsel prosecuted this case zealously and skillfully. As noted above, the case required significant efforts. For example, at several points, discovery negotiations faltered. Class Counsel determined that the Class's interests would be best served by seeking Judge Otazo-Reyes's assistance, and Class Counsel did not shirk in doing so. Indeed, Judge Otazo-Reyes remarked that discovery in this case was hard fought. Similarly, in moving for class certification, Class Counsel expeditiously filed their initial motion, took Defendants' expert's deposition, and filed their reply one business day later – notwithstanding the complex issues raised by the fact that this was one of the first cases addressing a new Supreme Court decision on class certification in securities class actions.

In many cases, plaintiffs can piggyback on a government investigation, or an accounting restatement. Here, there were none, and Defendants adamantly denied both that they made false statements and that they made them with scienter, increasing the difficulty of this litigation, and warranting an increased award. *Ressler v. Jacobson*, 149 F.R.D. 651, 654 (M.D. Fla. 1992); *In re Med. X-Ray Film Antitrust Litig.*, No. CV-93-5904, 1998 WL 661515, at *8 (E.D.N.Y. Aug. 7, 1998) (awarding 33% of the fund in part because "this is not a case where plaintiffs' counsel can be seen as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made the kill").

The quality of opposing counsel is also important in evaluating the quality of Lead Counsel's work. *See, e.g., Sunbeam,* 176 F. Supp. 2d at 1334; *Ressler*, 149 F.R.D. at 654. Defendants were represented by experienced and highly-skilled lawyers from Akerman LLP, an Am Law 200 which was named a "Florida Powerhouse" by Law360, and its partner Brian Miller, who chairs its Securities Litigation Practice, and . Defense counsel have reputations for vigorous advocacy in the defense of complex civil cases such as this. (Rosen Dec. ¶ 15). That Class Counsel obtained this significant Settlement in the face of such shows that its representation was excellent.

### 5. **Preclusion of Other Employment**

11

When Class Counsel undertook to represent Plaintiffs in this matter, it understood that it would spend significant time and make significant out-of-pocket expenses. Class Counsel did not settle this case quickly, but only after surviving a motion to dismiss, certifying a class, and nearly completing discovery. The time spent by Class Counsel on this case was at the expense of the time that they could have devoted to other matters.

### 6. The Customary and Contingent Nature of the Fee

The "customary fee" in a class action lawsuit of this nature is a contingency fee because virtually no individual possesses a sufficiently large stake in the litigation to justify paying his attorneys on an hourly basis. *See Ressler*, 149 F.R.D. at 654; *see also Norman v. Hous. Auth. of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988).

The Court should give substantial weight to the contingent nature of Class Counsel's fees when assessing the fee request. *See Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 548 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990). Courts have consistently recognized that the risk of receiving little or no recovery is a major factor in determining the award of fees, and that skilled counsel should be encouraged to undertake this risk. *See In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1364 (S.D. Fla.2011) ("Numerous cases recognize that the contingent fee risk is an important factor in determining the fee award."); *Pinto*, 513 F. Supp. 2d at 1339 ("attorneys' risk is 'perhaps the foremost factor' in determining an appropriate fee award"); *Behrens*, 118 F.R.D. at 548 (S.D.Fla. 1988) ("A contingency fee arrangement often justifies an increase in the award of attorneys' fees"). This case is fully contingent, meaning that Class Counsel has not received any payments whatsoever and has put up more than $167,000 of its own money for out-of-pocket expenses, and paid attorney salaries (not counted in the $167,000) for the duration of the case.

Experience eventually teaches every lawyer that there is no such thing as a certain win in litigation. In similar cases, plaintiffs' counsel have suffered major defeats after years of litigation, trial, and appeals in which they expended millions of dollars in time and received no compensation at all. Even a victory at trial does not guarantee success, as the Court well knows from its *BankAtlantic* case. *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, No. 07-61542-CIV, 2011 WL 1585605, at *22 (S.D. Fla. Apr. 25, 2011). And even surviving post-trial motions in the district court is no guarantee of success on appeal. *Robbins v. Koger Props.*, 116 F.3d 1441, 1148-49(11th Cir. 1997) (reversing $81.3 million jury verdict in a securities class action after

almost seven years of litigation and rendering judgment in favor of defendant based on novel ruling that plaintiffs could not establish loss causation by showing the price of the security was inflated by the misrepresentations).

Because the fee in this matter was entirely contingent, the only thing that was certain was that Class Counsel would receive no fee if it obtained no recovery. The contingent nature of Class Counsel's representation strongly favors the requested fee.

### 7. The Results Obtained

Courts have consistently recognized that the result achieved is a major factor to be considered in making a fee award. *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) ("most critical factor is the degree of success obtained"); *Ressler*, 149 F.R.D. at 655 ("It is well-settled that one of the primary determinants of the quality of the work performed is the result obtained.").

The Settlement Amount of $3,500,000 is an outstanding result. In this case, Class Counsel retained a damages expert who analyzed Class Representatives' recovery (if Class Representatives won at trial, overcame Defendants' affirmative defense, maintained certification, and defeated Defendants' affirmative defenses). To arrive at a "best case" maximum estimate of damages, the expert made several very optimistic or ad hoc assumptions, for example that the entire stock drop on October 18 and 21 is attributed to revelation of Defendants' fraud, and that there were no shareholders who could not avail themselves of the presumption of reliance because they did not rely on the integrity of the market price.[11] With these optimistic assumptions, Class Representatives' expert estimates total maximum damages are $14.9 million. Rosen Dec. ¶4.[12] The Settlement thus returns an excellent 23.5% of maximum damages, more than double the average recovery. *See* Cornerstone, Securities Class Action Settlements 2013 Review and Analysis, at 9 (in cases with estimated damages of less than $50 million, median settlement between 1996-2012 returned 10.7% of estimated damages) ("Cornerstone Report");[13] *In re Rite Aid Corp. Sec. Litig.*, 146 F.Supp.2d 706, 715 (E.D. Pa. 2001) (noting that since 1995,

---

[11] *GAMCO Investors, Inc. v. Vivendi, S.A.*, 927 F. Supp. 2d 88, 95 (S.D.N.Y. 2013) (entering judgment in favor of defendant because investor did not rely on integrity of market price).
[12] Defendants dispute Class Representatives' damages estimate.
[13] Available at < http://securities.stanford.edu/research-reports/1996-2013/Settlements-Through-12-2013.pdf >.

13

class action settlements have typically recovered "between 5.5% and 6.2% of the class members' estimated losses").

And the Settlement provides for payment to Class Members now, without delay, and not some wholly-speculative payment of a hypothetically-larger amount years down the road. "[M]uch of the value of a settlement lies in the ability to make funds available promptly." *In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1396, 1405 (E.D.N.Y. 1985).

Defendants' insurance coverage totaled $5 million, and decreased dollar-for-dollar as it paid Defendants' attorneys' fees and costs. The Settlement returns all of what remains of the insurance. Any additional recovery would be difficult, and would require many years of additional litigation with no promise of recovering anything from Catalyst's evanescent assets or the personal assets of McEnany.

### 8. The "Undesirability" of the Case

This is a complex case against defendants with modest financial resources. Catalyst is a development stage company with little insurance and no revenues. When this case was filed, Catalyst only had enough cash to fund its operations through the end of 2014, long before a verdict could be entered in this case.[14] Two other law firms filed substantively identical complaints, but both complaints were withdrawn before Defendants filed any motion to dismiss. Unlike in the Court's *BankAtlantic* case, or indeed most securities class actions brought in this District,[15] Class Counsel were the only attorneys willing to take on this difficult case. The results achieved show that this was a meritorious case that should have been brought, but the fact that no other firm was willing to take it shows that it was also an undesirable case.

### 9. The time limitations imposed by the client or the circumstances

While not a limitation *per se*, Class Counsel worked with the Court's schedule to take this case through from filing to settlement hearing in about 16 months. The median time from filing to settlement hearing in securities class actions is about 38.4 months. Cornerstone Report, at 19. This rapid-paced litigation ensures that class members will receive payments much more

---

[14] Catalyst Pharmaceutical Partners, Inc., 10-K for the year ended December 31, 2013, at 4, available at < http://www.sec.gov/Archives/edgar/data/1369568/000119312514104658/d660168d10k.htm>.

[15] Of the five most recent securities class action settlements in this district, discussed above, two (*IBM* and *Imperial Holdings*) were not subject to the PSLRA approval process, two (*Searchmedia Holdings* and *Aracruz Celulose*) generated three lead plaintiff motions, and only one (*Chanticleer Holdings*) generated only one lead plaintiff motion.

14

quickly than investors usually do in securities class actions, warranting a higher award. *Ressler*, 149 F.R.D. at 655.

### C. Important Public Policy Considerations Support The Requested Fees

Public policy considerations support the requested fee award, as courts recognize that compensating attorneys in securities class actions is important. "Congress, the Executive Branch, and this Court, moreover, have 'recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission.'" *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1201 (2013); *Halliburton Co. v. Erica P. John Fund, Inc.*, No. 13-317, Brief for the United States as Amicus Curiae Supporting Respondent, at 1-2 (similar). Courts should award fees high enough to encourage lawyers to bring meritorious actions. *Ressler*, 149 F.R.D. at 657; *accord Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1217 (S.D. Fla. 2006); *Wolff*, 2012 WL 5290155, at *5. In this case, the rationale is especially compelling. Class Counsel have delivered class members more than twice what the median securities class action provides. Thus, this is a case that should have been filed and prosecuted, but would not have been but for Class Counsel.

### D. Lead Counsel's Expenses Are Reasonable and Were Necessarily Incurred to Achieve the Benefit Obtained.

Litigation expenses should be reimbursed if they are "reasonable and necessary to obtain the settlement." *Ressler*, 149 F.R.D. at 657; *see also Dowdell v. City of Apopka*, 698 F.2d 1181, 1192 (11th Cir. 1983) ("all reasonable expenses incurred in case preparation, during the course of litigation, or as an aspect of settlement of the case" may be recovered); *Behrens*, 118 F.R.D. at 549 ("plaintiff's counsel is entitled to be reimbursed from the class fund for the reasonable expenses incurred in this action"); 1 Alba Conte, Attorney Fee Awards, § 2.19, at 73-74 (3d ed. 2006) ("*Alba Conte*") ("an attorney who creates or preserves a common fund by judgment or settlement for the benefit of a class is entitled to receive reimbursement of reasonable fees and expenses involved").

Class Counsel efficiently litigated this action and incurred expenses totaling $167,658.54 in connection with the prosecution and resolution of the Action. *See* Rosen Dec., ¶26. These expenses include amounts incurred to pay fees of consulting experts, mediation fees, copying,

15

telephone, travel costs, computer-assisted research, court fees, travel, mailing and fax costs, and other customary expenditures.

Travel, experts, copying, court fees, claims administration and other customary expenditures should be reimbursed. *In re Friedman's, Inc. Sec. Litig.*, No. 1:03-CV-3475WSD, 2009 WL 1456698, at *4 (N.D. Ga. May 22, 2009); *Cifuentes v. Regions Bank*, No. 11 CV 23455 FAM, 2014 WL 1153772, at *8 (S.D. Fla. Mar. 20, 2014). Courts differ about whether legal research costs are recoverable. *Compare Alba Conte*, 2.19, at n.16 ("Reasonable costs of computerized legal research are generally reimbursable"); *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1178 (S.D. Cal. 2007) (computer legal research costs recoverable because essential); *In re Genta Sec. Litig.*, No. CIV. A. 04-2123 JAG, 2008 WL 2229843, at *11 (D.N.J. May 28, 2008) (similar); *and In re UnitedHealth Grp. Inc. S'holder Derivative Litig.*, 631 F. Supp. 2d 1151, 1160 (D. Minn. 2009) (computer legal research costs are recoverable because they are routinely assessed to individual clients) *with Friedman's*, 2009 WL 1456698, at *4 (declining to award reimbursement of legal research costs). Class Counsel request that the Court award reimbursement for legal research costs, in line with the majority position, as set out in *Alba Conte*. Excluding legal research costs, Class Counsel's expenses are $164,272.54.

The expenses incurred were reasonable and necessary to successfully prosecute this case. The Notice informed Settlement Class Members that Lead Counsel would seek reimbursement of expenses in an amount not to exceed $200,000. *See* Bravata Dec., Ex. A. To date, there have been no objections to Lead Counsel's request for expenses. *Id.* at ¶10. The deadline to object is March 2, 2015. *Id.*

### E. Payments to Class Representatives

Service awards "compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1357 (S.D. Fla. 2011) (granting service awards of $5,000 per class representative). Courts determine service awards by looking at "(1) the actions the class representatives took to protect the interests of the class; (2) the degree to which the class benefited from those actions; and (3) the amount of time and effort the class representatives expended in pursuing the litigation." *Id.* Courts in this district commonly authorize service awards. *Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334, 1344 (S.D. Fla. 2007) ($7,500 per plaintiff). Courts have authorized substantial payments to lead plaintiffs whenever

16

requested in each of the last five securities class action settlements approved in this District. *Aracruz Celulose*, at ¶ 16 ($40,000); *IBM*, at 11 ($1,500 for each class representative); *Imperial Holdings*, at ¶21 ($10,000).

  Here, Class Representatives were the only class members who moved to be appointed as lead plaintiffs.[16] Without their efforts, there would have been no case, and no recovery for class members. And their efforts were substantial. Mr. Vizcay Aranaz flew from Madrid to Miami – twice – requiring two travel days each trip. Taking into account a day of deposition preparation, Mr. Viscay Aranaz dedicated seven full days to his deposition and the mediation. Mr. Pereira served the class even as his wife suffered a serious, debilitating medical emergency, and then flew from Texas to Miami for the mediation. The Notice informed the class that Class Representatives would seek an award of $10,000 each. There were no objections. Thus, the Court should award Class Representatives $10,000 each.

### III. CONCLUSION

  For the foregoing reasons, the Court should award Class Counsel $33^{1/3}$% of the Gross Settlement Fund, or $1,166,666.67, award reimbursement of expenses of $167,658.54, and award Class Representatives $10,000 each.

Dated: February 16, 2015     Respectfully submitted,

              **THE ROSEN LAW FIRM, P.A.**

               /s/ Laurence Rosen
              Laurence M. Rosen
              Fla. Bar No. 0182877
              275 Madison Avenue, 34th Floor
              New York, New York 10016
              Phone: (212) 686-1060
              Fax: (212) 202-3827

              *Class Counsel*

---

[16] Mr. Rijnsburger initially moved for appointment but later withdrew.

CERTIFICATE OF SERVICE

I hereby certify that on this day, February 16, 2015, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ Laurence Rosen